CROMER FINANCE LTD. and Prival N.V., et al., Plaintiffs,

v.

Michael BERGER, Fund Administration Services (Bermuda) Ltd., Ernst & Young International, Ernst & Young Bermuda, Kempe & Whittle Associates Limited, Deloitte & Touche (Bermuda), Deloitte Touche Tohmatsu, Deloitte & Touche L.L.P., Bear Stearns & Co., Inc., Bear Stearns Securities Corp., Financial Asset Management, Inc., and John Does 1–100, Defendants.

ARGOS et al., Plaintiffs,

v.

Michael BERGER, Financial Asset Management, Inc., Fund Administration Services (Bermuda) Ltd., Ernst & Young International, Deloitte Touche, Deloitte Touche Tohmatsu, Deloitte & Touche L.L.P., Bear Stearns & Co., Inc., and Bear Stearns Securities Corp., Defendants.

Nos. 00 CIV. 2284(DLC), 00 CIV. 2498 (DLVC).

United States District Court, S.D. New York.

April 17, 2001.

Richard L. Stone, Jeffrey H. Squire, Mark A. Strauss, Kriby, McInerney & Squire, LLP, New York City, for Plaintiffs Cromer Finance, Ltd. et al.

Steven S. Honigman, Richard P. Swanson, Jonathan E. Polonsky, Veronica E. Rendon, Alexandera Khlyavich (admission pending), Thelen Reid & Priest LLP, New York City, for Plaintiffs Cromer Finance, Ltd. et al.

Steven E. Greenbaum, Scott M. Berman, Berlack, Israels & Liberman LLP, New York City, for Plaintiffs Argos et al.

Daniel J. Kramer, Harry S. Davis, Adam J. Freedman, Schulte Roth & Zabel LLP, New York City, for Defendants Bear Stearns Securities Corp. and Bear Stearns & Co., Inc.

Gregg L. Weiner, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Defendants Fund Administration Services (Bermuda), Ltd., Kempe & Whittle Associates Limited, and Ernst & Young Bermuda.

Richard A. Martin, Manuel A. Mercader, Heller Ehrman White & McAuliffe LLP, New York City, for Defendant Ernst & Young International.

Michael J. Dell, Gregory Horowitz, Susan D. Hawkins, Kramer Levin Naftalis & Frankel LLP, New York City, for Defendant Deloitte & Touche Bermuda.

John T. Behrendt, Mark B. Holton, Gibson, Dunn & Crutcher LLP, New York City, for Deloitte Touche Tohmatsu.

Timothy P. Harkness, Davis Polk & Wardwell, New York City, for Defendant Deloitte & Touche LLP.

Martin I. Kaminsky, Edward T. McDermott, Pollack & Kaminsky, New York City, for Defendant Financial Asset Management, Inc.

Roger Marting, Circleville, OH, for Defendant Financial Asset Management, Inc.

## OPINION AND ORDER

COTE, District Judge.

These actions arise from alleged violations of the federal securities laws as well as related state law claims. Plaintiffs Cromer Finance Ltd. ("Cromer") and Prival N.V. ("Prival") (collectively, the "Cromer Plaintiffs") filed a class action complaint on March 24, 2000. Plaintiffs in the Argos action (collectively, the "Argos Plaintiffs") filed a complaint on April 3, 2000. The cases were accepted by this Court as related to *SEC v. Berger*, 00 Civ. 333.

The plaintiffs were investors in an offshore investment fund managed from New York by Michael Berger ("Berger"). That fund traded United States securities, and the plaintiffs allege enormous losses based on Berger's fraudulent management of the fund. They have sued, among others, the Bermuda accounting firms that served as the fund's administrators or auditors, as well as American and international affiliates of those Bermuda entities. All of the defendants except Berger have moved to dismiss the complaints in these two actions.[1] The affiliates of the Bermuda ac-

---

1. After the motions were fully submitted, the Cromer plaintiffs and those defendants mov-

counting firms do not contest that there is personal jurisdiction over them, but they do deny any involvement with Berger's fund or the fraud and contend that they have been sued in a search for "deeper pockets." The Bermuda entities argue, among other things, that there is neither subject matter jurisdiction over the claims against them nor personal jurisdiction over them individually.

The motions to dismiss by the affiliates of the Bermuda entities, as well as the United States clearing broker for the fund's trading, are granted. In brief, there are insufficient allegations that these defendants knew of or assisted in the alleged fraud. Each of the many theories asserted by the plaintiffs to impose derivative liability on them for the alleged misdeeds of Berger and the Bermuda-based entities fail. In addition, certain claims against one of the Bermuda-based fund administrators is dismissed as barred by the statute of limitations, and for other reasons. The remaining motions to dismiss the Cromer action are largely denied. In particular, the Court concludes it has both subject matter and personal jurisdiction over the Bermuda-based defendants. The parties shall have ten days in which to notify the Court why the analysis in this Opinion does not resolve the motions to dismiss the claims in the Argos Complaint as well.

## BACKGROUND [2]

This lawsuit is brought as a securities class action on behalf of purchasers of securities of the Manhattan Investment Fund, Ltd. ("Fund") during the class period, defined as October 1, 1995, through January 18, 2000. As a result of the defendants' conduct, plaintiffs [3] and Class members have allegedly suffered damages of approximately $400,000,000.

The facts alleged in the Complaint include the following. Berger, a 28 year-old investment manager, established the Fund as an "open end investment company" in or about December 1995, under the laws of the British Virgin Islands. The Fund was designed for foreign investors and United States tax-exempt investors (e.g., pension funds and trusts). Through his wholly-owned company, Manhattan Capital Management, Inc. ("MCM"), Berger served as the investment manager and advisor for the Fund. The Fund had no offices, employees or operations of its own. Berger made investment decisions at MCM's offices in New York, and all of the Fund's assets were held in custody in New York by defendants Bear Stearns & Co., Inc. and Bear Stearns Securities Corp. (collectively, "Bear Stearns"), an investment bank and registered broker dealer.[4]

---

ing to dismiss based on lack of personal jurisdiction were permitted to submit additional briefing and record evidence regarding the allegations in the Cromer Complaint that defendant Fund Administration Services (Bermuda) Ltd. sent Net Asset Value statements to investors, investors' agents, or prospective investors in the Manhattan Investment Fund, Ltd. located in the United States.

2. The information in this section derives primarily from the Complaint in the Cromer action, and "plaintiffs" refers to the Cromer Plaintiffs. The facts and allegations in the Argos action are substantially similar.

3. The Cromer action has two proposed lead plaintiffs: Cromer, a British Virgin Islands registered investment corporation, and Prival, a Netherlands Antilles corporation. Both lead plaintiffs purchased shares in the Fund. Plaintiffs in the Argos action are twenty-eight Fund shareholders, each of whom invested between $400,000 and $16,000,000 in the Fund.

4. At the Fund's inception, Berger opened an account in the Fund's name with the Bank of Bermuda as a depository for new investor monies. Moneys deposited in the account were transferred to the Fund's clearing account at Bear Stearns almost every month.

According to its confidential offering memorandum ("Offer Memo"), the Fund's investment objective was to "achieve capital appreciation, consistent with the preservation of capital" by investing "primarily in highly liquid listed issues." The Offer Memo informed investors that the Fund's investment technique included "short-selling" as well as the use of "leverage" or "margin."[5] It also explained that the Fund's administration services were provided by "Fund Administration Services (Bermuda) Limited, an affiliate of Ernst & Young International" or "Kempe & Whittle Associates Limited, an affiliate of Ernst & Young International," and that the Fund had retained "Deloitte & Touche" at a Bermuda address, as independent auditors.[6] The plaintiffs contend that defendants Ernst & Young International ("EYI"), Ernst & Young Bermuda ("EYB"), Kempe & Whittle Associates Ltd. ("K & W"), and Fund Administration Services (Bermuda) Ltd. ("FASB") held themselves out and functioned as "a single, unified company that performed administrative services on behalf of the Fund." Likewise, the plaintiffs allege that defendants Deloitte & Touche (Bermuda) ("DTB"), Deloitte Touche Tohmatsu ("DTT"), and Deloitte & Touche LLP ("DTUS") functioned as a "unified, multinational accounting firm" in this case.

The Fund commenced trading operations in or about Spring 1996, with an investment strategy that primarily involved the "concentrated short selling of securities of United States technology companies, including Internet companies, on the theory that those companies were trading at over-valued prices and were due for a correction." After an initial offering at $100 per share, with a minimum investment of 250 shares, the Fund offered its shares at a net asset value ("NAV") computed "to the penny" and determined on the basis of the listed prices on major securities exchanges of the securities held by the Fund. The NAV was calculated by EYB, K & W, and later FASB, on a monthly basis, based on daily, monthly, and yearly statements prepared by Bear Stearns. As sole custodian of the Fund's assets, Bear Stearns cleared all securities transactions. While Berger utilized many brokers, Bear Stearns was the only broker to extend margin credit in connection with the clearing and settlement of the Fund's trades. As of January 2000, the Fund had more than 200 investor accounts.

Berger utilized defendant Financial Asset Management, Inc. ("FAM") as an "introducing broker" which cleared all of its trades through Bear Stearns. Berger and FAM shared office space in New York, and the Complaint alleges that FAM collected "substantial commission income" as a result of its role in the Fund.

---

5. The Complaint alleges that the Federal Reserve Board ("FED") and the New York Stock Exchange ("NYSE"), of which Bear Stearns is a member, regulate the use of margin debt. Under Regulation T, the FED sets the amount of margin credit which may be extended in connection with the initial purchase of a security, while NYSE Rule 431 regulates the "maintenance margin," or the minimum equity that must be maintained in a customer's account. The Complaint also alleges that the Offer Memo states that the Fund will use "concentration limitations," in that no more than 25% of the portfolio would be invested in a single sector and individual issues would never account for more than 15–20% of the portfolio's value. Finally, Bear Stearns, in its role as sole custodian of the Fund's assets, enforced its own maintenance margin requirement set initially at 35% of the Fund's total assets, subject to adjustment.

6. Contrary to the Complaint, the Fund's Offer Memo does not identify "Deloitte & Touche" generally as the Fund's independent auditor or "Ernst & Young" generally as the Fund's administrators.

*The Fraud*

The plaintiffs allege that the fraudulent scheme began almost immediately after the Fund began trading operations in or about Spring 1996. According to the Bear Stearns monthly account statements and daily trading reports, Berger began losing money on a regular basis from the Fund's inception.[7] Rather than accurately reporting these losses, Berger created "fictitious monthly account statements, purportedly in the name of FAM, which showed profitable performance for the Fund." These actions continued until early 2000, when Berger, after the United States Securities and Exchange Commission ("SEC") had initiated an investigation of the Fund, released a statement admitting to the fraud.

1. *Involvement of Bear Stearns*

Plaintiffs allege that Bear Stearns: (1) extended margin credit to the Fund which comprised "atypical, extraordinary and non-routine financing transactions" and exceeded the margin regulations established by the FED, NYSE, and Bear Stearns' own rules discussed above, and (2) tipped certain investors with whom Bear Stearns had social or business relationships as to the Fund's problems. As a result of these actions, Bear Stearns made "substantial profits" on margin interest and fees, enabled the Fund to continue its operations by obtaining new funds from investors and avoiding redemptions of investments, and assisted their own customers in withdrawing money from the Fund at the expense of remaining investors.

The plaintiffs allege that Bear Stearns' over-extension of margin credit to the Fund enabled Berger to trade on margin credit in excess of applicable margin rules throughout the Class Period and to violate the concentration limitations applied by Bear Stearns and set forth in the Offer Memo.[8] Even when Berger had outstanding unsatisfied margin calls, Bear Stearns extended "intra-day" margin credit to him which at times exceeded 100% of the Fund's capital. Because the margin deficits were not satisfied within the prescribed regulatory periods, Regulation T and Rule 431 required Bear Stearns to freeze the Fund's account. Bear Stearns failed to freeze the Fund. Bear Stearns further failed to apply Rule 431 by not enforcing the shorter periods given to cover margin calls by Rule 431 for day traders like Berger, allowing Berger to maintain the account in an under-margined state, and allowing Berger to meet margin calls by liquidating margined positions. In sum, Bear Stearns' actions contributed to a "cycle" in which Bear Stearns extended excessive margin credit to the Fund, Berger used the credit to trade and generate substantial losses, and those losses further increased the margin debt. Bear Stearns then agreed to await an influx of new investor monies to satisfy the debt, and once the new money was used to pay down the margin debt, the cycle recommenced. As a result of these activities, Bear Stearns earned "significant fees and margin interest" on the Fund's account.

The plaintiffs further note that Bear Stearns knew or was reckless in not knowing that new investors in the Fund, whose money was being used to satisfy pre-existing margin deficits and to mask Berger's

7. For example, the Bear Stearns statement for June 1996, reveals a loss of approximately $700,000, or almost 30% of the Fund's value in that month. In September 1996, the Fund lost over $5,000,000, an amount "equal to more than half the Fund's equity." In October and November 1996, the Fund lost 15% and 40% of the Fund's equity, respectively.

8. For example, at one point the Fund was short 150% of the Fund's capital in a single stock, Earthlink.

high trading losses, were unaware of the true financial condition of the Fund.[9] As a result, Bear Stearns enabled Berger to raise money from unsuspecting investors to pay off the Fund's margin debts, thereby gaining substantial profits for itself in the form of interest income on margin debt as well as commissions and fees on trading activity.

The plaintiffs also allege that Bear Stearns used non-public material information regarding the Fund's inflated NAV—information known to Bear Stearns by virtue of its custody of the Fund—in order to warn those Fund investors with whom Bear Stearns and Bear Stearns executives shared "business and social relationships." Bear Stearns continued to over-extend margin credit to the Fund in order to keep the Fund liquid long enough to enable those investors to withdraw their money at artificially inflated NAVs. The plaintiffs allege that Bear Stearns thereby "enhanced its position" at the expense of "unsuspecting investors" who remained in the Fund, including plaintiffs and other Class members, whose interests were diluted as a result of the redemptions at artificially inflated NAVs.

### 2. Involvement of EYI, EYB, K & W, and FASB

The plaintiffs allege that the "Ernst & Young Defendants" used the fictitious statements created by Berger on FAM letterhead to prepare materially inflated NAV calculations and disseminate them to investors, despite receiving from Bear Stearns daily, monthly, and yearly statements accurately reflecting the Fund's losses and despite the Offer Memo's representation that Bear Stearns—and not FAM [10]—would have custody of all of the Fund's assets. For example, the NAV calculation overstated the market value of the Fund's assets by roughly $400,000,000 in August 1999. Plaintiffs allege that they and other Class members relied on the fictitious reports and "would not have purchased or maintained their shares in the Fund" if they had known that the monthly NAV statements were materially false and misleading.

These defendants initially prepared an "apparently accurate NAV" in September 1996, reflecting the Fund's losses, which they sent to Berger. When one of Berger's employees asked them to "hold off" on the NAV issuance, the Ernst & Young defendants complied and then used Berger's fictitious statements to publish a revised—and inaccurate—NAV statement. This was contrary to the Ernst & Young defendants' own "checklist" of procedures for NAV calculation, which required an examination of the Bear Stearns account statement and provided a box to check once the task was completed. In addition, the fictitious statement prepared by Berger was "suspicious on its face" in that it was prepared using a plain spreadsheet on an ordinary wordprocessor without any

---

9. The plaintiffs allege that Bear Stearns' "risk control department" was aware of the Fund's "precarious position" both because of daily contact with Berger regarding the Fund's margin violations and as a result of an internal e-mail message dated December 28, 1999, which demonstrated long-time knowledge of the violations. Bear Stearns, however, only moved to require compliance with the margin rules in late December 1999.

10. The plaintiffs allege that if the Ernst & Young personnel had made "the most rudimentary inquiry" into FAM, they would have learned that FAM was a one-broker operation, with only $1,000,000 in assets, which cleared all of its clients' trades through Bear Stearns and that FAM did not meet the National Association of Securities Dealers ("NASD") requirements for broker-dealers concerning clearing trades and holding custody of third-party assets.

identifying letterhead, used the same account number as the Fund's account at Bear Stearns, and, unlike the Bear Stearns statements, contained no daily trading activity information or almost any other information aside from the purported equity in the account. The plaintiffs allege that these defendants continued to use the fictitious statements and to issue shares to new investors and redeem shares of existing investors at the inflated NAV even though they had concerns regarding possible fraud as early as Summer 1998.[11]

### 3. *Involvement of DTT, DTB, and DTUS*

The plaintiffs allege that "Deloitte" issued "clean," unqualified auditing reports for the years 1996–1999, attesting to the accuracy of the Fund's financial statements and including a statement that "[i]n our opinion, such financial statements represent fairly, in all material respects, the financial position of the [Fund], in conformity with accounting principles generally accepted in the United States of America." The audit reports, discussed in the Complaint with an example attached as an exhibit, bear the names and logos of DTT as well as "Deloitte & Touche" with an accompanying Bermuda address. They are addressed to "the Shareholders" of the Fund and signed "Deloitte & Touche," in a cursive signature. The plaintiffs allege that Deloitte "pretended to have knowledge where it actually had none, and therefore its audits amounted to no audits at all." In particular, the Deloitte opinions were "materially inaccurate" and Deloitte failed to conduct its audits in accordance with United States generally accepted auditing standards ("GAAS"), failed to plan and perform its audits to obtain "reason-

able assurances that the Fund's financial statements were free of material misstatements," and did not include procedures "reasonably designed and conducted to obtain confirmation of the securities purportedly owned by the Fund."

The plaintiffs allege that Deloitte had "full and complete access" to the books and records of the Fund as maintained by the Ernst & Young defendants and therefore had access to the fictitious financial statements as well as the accurate Bear Stearns statements. The plaintiffs further allege that Deloitte ignored numerous warning signs regarding the Fund's financial difficulties. For example, the fictitious statements were inconsistent with the Bear Stearns statements, but Deloitte "recklessly followed Berger's unorthodox and suspicious instructions to ignore the *accurate* statements sent by Bear Stearns" which, according to Berger, did not reflect the Fund's entire portfolio while the fictitious statements did (emphasis in original). In addition, Deloitte noticed a discrepancy during its first audit between the Bear Stearns and fictitious financial statements, yet simply accepted Berger's direction to ignore the Bear Stearns statements without checking directly with Bear Stearns or with FAM to investigate further. Further, Deloitte accepted audit confirmation requests from Berger, instead of insisting and ensuring that they came directly from FAM, thus violating one of the "most basic responsibilities of an auditor." Finally, the fictitious statements represented that the securities were "held at FAM," which directly contradicted the Offer Memo. As with the Ernst & Young defendants, plaintiffs allege that if the Deloitte defendants

---

11. For example, the Argos plaintiffs allege that a shareholder asked FASB in September 1999, to "address certain questions concerning the Fund's NAV." FASB sent a letter to the Argos plaintiffs indicating that it had "received month-end position listings from the Fund's broker," which plaintiffs allege implied that the reported NAVs were consistent with the Bear Stearns statements.

had made "even a rudimentary inquiry" into FAM, they would have discovered it to be incapable of serving as the clearing house for or custodian of the Fund's assets.

The plaintiffs also allege that even after Deloitte was "specifically alerted" to discrepancies and the possibility of fraud, it failed to take necessary investigative steps. The head of Bear Stearns' prime brokerage operations called a partner at DTUS in February 1999, to warn him of a discrepancy from what would be expected if the Fund were selling short internet stocks. While the DTUS partner sent a warning e-mail to partners in other offices and spoke to the DTB partner in charge of the Fund's audits, no follow up occurred and Deloitte completed and signed off on a "clean, unqualified" audit opinion in March 1999. Because shares of the Fund were not publicly traded, investors and prospective investors had "no independently verified third-party financial information" other than Deloitte's audit report and the audited financial statements. The plaintiffs allege that Deloitte "knew or should have known that its clean audit reports were material to investors' decisions to purchase shares in the Fund and to refrain from redeeming their investments, and that investors were placing substantial reliance on Deloitte's clean audit reports."

### 4. Involvement of FAM

FAM is a "relatively small brokerage firm" with its principal place of business in Ohio. Plaintiffs allege that FAM served as one of the Fund's introducing brokers, placing trades for customers which were then cleared or settled through Bear Stearns. Plaintiffs further allege that Berger had previously worked as a consultant for FAM in developing European clients and trading strategies and therefore had a prior relationship with FAM

and its principal, James Rader ("Rader"). Berger continued his relationship when he established the Fund, sharing office space with FAM in New York and enabling the small firm to collect "substantial commission income." The Complaint alleges that when Deloitte requested that FAM reply directly to it concerning an audit confirmation, FAM instead complied with Berger's "highly irregular request" to provide its confirmation to him. FAM further provided Berger with an open, pre-addressed Airborne Express envelope and bill made out to DTB, falsely showing FAM in Ohio as the sender. Because it was receiving monthly account statements for the Bear Stearns account, FAM knew that the Fund was experiencing large losses but that investors were continuing to invest additional monies with the Fund.

### Exposure of the Fraud

The plaintiffs allege that the defendants' fraudulent acts continued until the SEC initiated an investigation of the Fund in November 1999. On January 7, 2000, Deloitte withdrew its audit reports for the years ending December 31, 1996, 1997, and 1998, stating that the investors could no longer rely on the reports. On January 13, 2000, the Ernst & Young defendants resigned as the Fund's administrator. The following day Berger admitted to the fraud and was subsequently charged with violations of Title 17 of the securities laws and with fraud under the Investment Adviser's Act. The SEC also commenced an action in this Court, alleging that Berger, MCM, and the Fund violated various anti-fraud provisions of the federal securities laws.

### Causes of Action

The Cromer plaintiffs bring twenty-one causes of action. Against all defendants submitting motions to dismiss, plaintiffs allege aiding and abetting both common

law fraud and breach of fiduciary duty.[12] Against FAM, the plaintiffs additionally allege gross negligence and negligence. Against all defendants except Bear Stearns and FAM, plaintiffs additionally allege violation of Section 10(b) of the Securities Exchange Act ("Exchange Act"), violation of Rule 10b–5, common law fraud, gross negligence, negligence, and professional malpractice. Against EYI, EYB, K & W, and FASB, plaintiffs additionally allege negligent misrepresentation. Finally, against EYI, EYB, and DTT, plaintiffs additionally allege violation of Section 20(a) of the Exchange Act under a "controlling person" theory.[13]

## LEGAL STANDARDS FOR DISMISSAL

The defendants bring their motions to dismiss pursuant to one or more of Rules 12(b)(1), (b)(2), and (b)(6) and 9(b), Fed. R.Civ.P.

### A. Rule 12(b)(1)

To determine jurisdiction in federal question cases, the court need only ask "whether—on its face—the complaint is drawn so as to seek recovery under federal law or the Constitution. If so, [the court should] assume or find a sufficient basis for jurisdiction, and reserve further scrutiny for an inquiry on the merits." *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1189 (2d Cir.1996). The standard is a "modest" one, allowing for subject matter jurisdiction so long as "the federal claim is colorable." *Savoie v. Mer-*

*chants Bank,* 84 F.3d 52, 57 (2d Cir.1996) (citing *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).

In assessing a motion to dismiss for lack of subject matter jurisdiction, a court must "accept as true all material factual allegations in the complaint," *Shipping Fin. Serv. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)), but refrain from "drawing from the pleadings inferences favorable to the party asserting [jurisdiction]." *Id.* (citing *Norton v. Larney,* 266 U.S. 511, 515, 45 S.Ct. 145, 69 L.Ed. 413 (1925)). Courts evaluating Rule 12(b)(1) motions "may resolve the disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits." *Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000). Where jurisdiction is "so intertwined with the merits that its resolution depends on the resolution of the merits," the court should use the standard "applicable to a motion for summary judgment" and dismiss only where "no triable issues of fact" exist. *London v. Polishook,* 189 F.3d 196, 198–99 (2d Cir.1999) (citation omitted); *see also Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 121 n. 1 (2d Cir.1998)

### B. Rule 12(b)(2)

It is well established that on a Rule 12(b)(2) motion to dismiss for lack of per-

---

**12.** These claims represent the entirety of claims alleged against Bear Stearns.

**13.** The Argos plaintiffs bring eight causes of action, substantially similar to the Cromer allegations with the following differences: (1) EYB and K & W are not defendants in the Argos action; (2) As against FASB and EYI, the Argos plaintiffs additionally allege breach of fiduciary duty but do not allege gross negli-

gence or professional malpractice; (3) As against EYI, the Argos plaintiffs do not allege violation of Section 20(a); (4) As against DTT, DTB, and DTUS, the Argos plaintiffs do not allege gross negligence, negligence, or professional malpractice; and (5) As against FAM, the Argos plaintiffs do not allege gross negligence or negligence.

sonal jurisdiction, "the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir.1996). The plaintiff's burden depends on the procedural posture of the litigation. Where there has been no discovery, "a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction." *Id.* But where there has been discovery regarding personal jurisdiction, the plaintiff's burden is to make a *prima facie* showing which "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.* at 567 (citation omit,ted); *SEC v. Euro Sec. Fund, Coim SA*, No. 98 Civ. 7347(DLC), 1999 WL 76801, at *2 (S.D.N.Y. Feb. 17, 1999).

### C. Rule 12(b)(6)

A court may dismiss an action pursuant to Rule 12(b)(6) only if "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997) (citation omitted). The court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *Id.* The court is generally prohibited from considering matters outside the pleadings. *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325 n. 1 (2d Cir.1999). The court may consider, however, "any written instrument attached to [the Complaint] as an exhibit or any statements or documents incorporated in it by reference, ... and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000) (citation omitted). "General, conclusory allegations need not be credit-

ed, however, when they are belied by more specific allegations of the complaint." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir.1995).

### D. Rule 9(b)

■ Rule 9(b) sets forth special pleading requirements for claims involving fraud, and it is "well-settled" that a complaint alleging securities fraud must comport with Rule 9(b). *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000). Rule 9(b) requires that when alleging fraud "the circumstances constituting fraud ... must be stated with particularity," although "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." *See also id.* at 168. To comply with the requirements of Rule 9(b) in alleging the misstatement, an allegation of fraud must specify: "(1) those statements the plaintiff thinks were fraudulent, (2) the speaker, (3) where and when they were made, and (4) why plaintiff believes the statements fraudulent." *Koehler v. Bank of Bermuda (New York) Ltd.*, 209 F.3d 130, 136 (2d Cir.2000).

■ In pleading a securities fraud violation, a complaint must allege that a defendant acted with scienter. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000) (collecting cases). When pleading scienter, "with respect to each act or omission" alleged to violate the securities laws, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To satisfy this scienter requirement, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." *Rothman*, 220 F.3d at 90; *see also*

*Ganino,* 228 F.3d at 168–69; *In re Carter–Wallace Sec. Litig.,* 220 F.3d 36, 39 (2d Cir.2000). The Second Circuit has cautioned, however, that we should not be "wedded to" the "motive and opportunity" standard in light of Congress' failure to include this specific language in its recent amendment to the securities laws. *Novak,* 216 F.3d at 310.

■■ A plaintiff may sufficiently plead conscious misbehavior through allegations of deliberate illegal conduct. *See id.* at 308. To plead recklessness, a plaintiff must allege facts showing conduct that was "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman,* 220 F.3d at 90 (citation omitted). Recklessness has been sufficiently pled where there are specific allegations that a defendant knew of facts or had access to information contradicting his public statements, or where he failed to review information that he had a duty to monitor, or where he ignored obvious signs of fraud. *Novak,* 216 F.3d at 308. "Where plaintiffs contend [a] defendant[ ] had access to contrary facts, they must specifically identify the reports or statements containing this information." *Id.* at 309.

■ To plead facts supporting a strong inference of the requisite scienter by showing motive and opportunity, a plaintiff must allege facts showing "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged," and "the means and

likely prospect of achieving the concrete benefits by the means alleged." *Press v. Chemical Inv. Serv. Corp.,* 988 F.Supp. 375, 390 (S.D.N.Y.1997) (quoting *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994)). General allegations of motive "possessed by virtually all corporate insiders" are insufficient to raise a strong inference of fraudulent intent.[14] *Novak,* 216 F.3d at 307.

In its recent decision in *Novak v. Kasaks,* 216 F.3d 300, after summarizing prior case law, the Second Circuit explained that a complaint pleads facts sufficient to raise a "strong inference" of fraudulent intent where it sufficiently alleges that defendants:

(1) benefitted in a concrete and personal way from the purported fraud ...; (2) engaged in deliberately illegal behavior ...; (3) knew facts or had access to information suggesting that their public statements were not accurate ...; or (4) failed to check information they had a duty to monitor.

*Id.* at 311.

## DISCUSSION

### A. Bear Stearns

Bear Stearns brings its motion to dismiss pursuant to Rule 12(b)(6), arguing that plaintiffs fail to state their only claims against Bear Stearns—that it aided and abetted Berger's fraud and breach of fiduciary duty. Bear Stearns asserts that, under the facts alleged by the plaintiffs, Bear Stearns' actions did not "substantially assist" Berger's fraud but rather made it more difficult to accomplish. As the

---

**14.** For example, acting to "sustain the appearance of corporate profitability, or of the success of an investment" or to "maintain a high stock price in order to increase executive compensation" is not sufficient to show that a defendant possesses the requisite motive, while publicly misrepresenting facts regarding company performance in order to inflate stock price and profit personally from insider sales is sufficient. *Novak,* 216 F.3d at 307–08 (internal quotation omitted).

Complaint acknowledges, the reports issued by Bear Stearns accurately described the Fund's trading.

■ To state a claim for aiding and abetting fraud under New York law,[15] a plaintiff must plead facts showing: (1) the existence of a fraud; (2) defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission. *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000). The elements for a claim of aiding and abetting a breach of fiduciary duty under New York law are: (1) a breach by a fiduciary of obligations to another, and (2) that the defendant knowingly induced or participated in the breach. *Id.*

. ■ New York law has defined both "substantial assistance" and "participation" to exist where a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.,* No. 98 Civ. 4960(MBM), 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (citation omitted) (substantial assistance); *see also Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 284 (2d Cir.1992) (participation); *Estate of Ginor v. Landsberg,* 960 F.Supp. 661, 671 (S.D.N.Y.1996) (participation); *Kolbeck v. LIT Am., Inc.,* 939 F.Supp. 240 (S.D.N.Y.1996) (defining "participation" as "substantial assistance"). Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximate-

ly caused the harm on which the primary liability is predicated. *Diduck,* 974 F.2d at 284; *Kolbeck,* 939 F.Supp. at 249. "But-for" causation is insufficient; aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct. *Kolbeck,* 939 F.Supp. at 249. Inaction is "actionable participation only when the defendant owes a fiduciary duty directly to the plaintiff." *Id.* at 247.

There is no dispute regarding the first and second prongs of these tests. Bear Stearns does not deny the existence of an underlying fraud or that Berger breached his fiduciary duty to the plaintiffs, nor does it contest for the purposes of these motions that it had actual knowledge of those wrongs. Rather, the parties disagree as to whether the plaintiff has adequately alleged the "substantial assistance" and "participation" elements which, as discussed above, share largely identical requirements.

■ A clearing broker does not provide "substantial assistance" to or "participate" in a fraud when it merely clears trades. "The simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker." *Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22, 29 (2d Cir.2000). The plaintiffs have attempted to allege that Bear Stearns did more than just clear trades.

**15.** In a federal question action, a court looks to federal common law choice of law rules to decide which state's law governs the various legal claims. *Fromer v. Yogel,* 50 F.Supp.2d 227, 239 (S.D.N.Y.1999) (citing *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 795 (2d Cir. 1980)). The Second Circuit applies the law "of the jurisdiction with the greatest interest in the substantive legal claim at hand." *Id.* (citing *Corporacion Venezolana de Fomento,* 629 F.2d at 795). Except as noted below in the discussion of DTB's motion to dismiss, all of the parties discussing state law claims cite to and rely on New York law. Additionally, as discussed below, New York has the greatest interest in adjudicating this claim arising as a result of a fraud created in and managed from New York.

To meet their obligation to plead that Bear Stearns provided substantial assistance to the fraud, the plaintiffs have alleged that, in violation of the margin regulations of the FED, the NYSE, and its own institutional rules, it over-extended margin credit to Berger and permitted him to violate the concentration limitations ordinarily applied by Bear Stearns and described in the Offer Memo, and instead of freezing the Fund's account when it was required by regulations to do so, it allowed Berger to continue to trade. A failure to enforce margin requirements, or continuing to execute trades despite margin violations, however, does not constitute substantial assistance. *Dillon v. Militano,* 731 F.Supp. 634, 637, 639 (S.D.N.Y.1990); *Stander v. Fin. Clearing & Serv. Corp.,* 730 F.Supp. 1282, 1287 (S.D.N.Y.1990). Similarly, executing trades in order to reduce "a loan of money under margin" is insufficient to create liability. *Ross v. Bolton,* 639 F.Supp. 323, 327 (S.D.N.Y.1986).

None of the cases on which the plaintiffs rely are sufficient to overcome these long established principles. Neither *IIT v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980), nor the other cases cited by the plaintiffs permit allegations of heightened scienter to substitute for adequately alleged substantial assistance. Even the recent decision in *Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 510–13 (S.D.N.Y. 2001), upon which the plaintiffs place particular reliance, does not change this conclusion. In *Primavera,* the court denied summary judgment for Kidder, Peabody & Co. ("Kidder") on the ground that there was a genuine issue of material fact as to whether Kidder had substantially assisted the alleged fraud. Kidder and other brokers created the mortgage-backed securities sold to the plaintiff's funds. Kidder also loaned the funds the purchase price for the securities, using the securities as collateral. By creating and selling the securities and financing the transactions, Kidder reaped huge profits. Investors were sent monthly performance reports which included Kidder's valuation of the securities, which were particularly important since the securities were not traded on any public exchange. Kidder revised its valuation 86 times based on requests from the person who issued the monthly performance reports. The court found that there were material issues of fact as to whether the revised valuations were fraudulent and material to investors. The court rebuffed Kidder's request to segregate the allegations concerning the "valuation" fraud from the "operations" fraud, noting that "[s]ubstantial assistance can take many forms," and that the allegations should be considered together. *Id.* at 511. Thus, the court's observation that "[e]xecuting transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary motivation to aid in the fraud," *id.,* must be understood in context. Moreover, nothing in the opinion suggests that the court intended any relaxation to the requirement of a showing of proximate cause.

The remaining cases cited by the plaintiffs are also readily distinguished. *Graham v. SEC,* 222 F.3d 994 (D.C.Cir.2000), addressed the obligations of a retail broker, and not a clearing broker. The cases on which the plaintiffs rely for the general proposition that "non-routine" financial transactions can constitute substantial assistance involve conduct far more nefarious and with more direct involvement in the underlying fraud than that alleged here. In *Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 803 (3d Cir.1978), a bank "insisted" that the wrongdoer continue the fraud. In *ABF Capital Management v. Askin Capital Management, L.P.,* 957 F.Supp. 1308, 1329–30 (S.D.N.Y.1997), the

brokers were charged with creating "volatile and virtually unmerchantable securities," inducing their sales force to market the securities by multiplying their normal commission rates, and providing false and inflated "performance marks" to their customer for dissemination to investors. Finally, in *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 504 (S.D.N.Y.1987), the brokers participated in the creation of the document which contained the false statements. Others substantially assisted the fraud by reviewing and approving that document, devising the marketing and financial scheme for the fraud, and engaging in "atypical" financing transactions. In sum, the plaintiffs have failed to point to any authority for holding a clearing broker liable to investors for aiding and abetting a fraud because it violated margin requirements or over-extended credit.

The plaintiffs are unable to cure the defect in their pleading of substantial assistance by emphasizing that the alleged fraud included a Ponzi scheme that could not have functioned but for the extension of credit and margin violations. It is well established that there is no private right of action for a violation of margin regulations, which are designed to protect the viability of brokerage houses and not to protect investors. *See Bennett v. U.S. Trust Co. of New York*, 770 F.2d 308, 312 (2d Cir.1985); *Gruntal & Co. v. San Diego Bancorp*, No. 94 Civ. 5366(DC), 1996 WL 343079, at *4 (S.D.N.Y. June 21, 1996). Nor can the plaintiffs circumvent this principle by recasting their argument as one

based on common law fraud. *See Furer v. Paine, Webber, Jackson & Curtis, Inc.*, 1982 WL 1309, at *2 (C.D.Cal. Apr. 20, 1982). In any event, the plaintiffs have still failed to allege substantial assistance under this theory. While the Ponzi scheme may only have been possible because of Bear Stearns' actions, or inaction, Bear Stearns' conduct was not a proximate cause of the Ponzi scheme.[16] Bear Stearns' motion to dismiss is granted.

### B. EYB, FASB, and K & W

FASB, K & W, and EYB bring their joint motion to dismiss pursuant to Rules 9(b) and 12(b)(1), (b)(2), and (b)(6), Fed. R.Civ.P., and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b)(1) *et seq.* Alternatively, if the motion is denied, FASB, K & W, and EYB move for a more definite statement pursuant to Rule 12(e), Fed.R.Civ.P. These defendants make the following arguments: (1) This Court lacks personal jurisdiction over them because they lack the substantial, continuous and systematic contacts with the United States necessary to exercise personal jurisdiction over a foreign defendant; (2) This Court lacks subject matter jurisdiction over the plaintiffs' securities law claims because foreign plaintiffs purchasing securities in a foreign fund outside the United States cannot assert a claim under United States securities laws against a foreign entity that is not alleged to have taken any action within the United States material to the completion of the fraud; (3) The securities claims are insufficient under Rule 9(b), and the PSLRA

---

**16.** While *Fromer* could be read to relieve a plaintiff of the burden of showing proximate cause for aiding and abetting a breach of fiduciary duty, the court explicitly addressed the issues of proximate causation only in the context of a fiduciary's breach. 50 F.Supp.2d at 248. Given the sound reasons for imposing a heightened standard for a secondary actor's liability, *see ABF Capital,* 957 F.Supp. at 1331 n. 5, this court will follow those courts that have required allegations sufficient to support a finding of proximate causation not only for aiding and abetting a fraud, but also for aiding and abetting a breach of fiduciary duty. *See, e.g., Kolbeck,* 939 F.Supp. at 249.

because the plaintiffs fail to plead specific facts giving rise to a strong inference that the defendants acted with scienter; (4) The securities laws claims against K & W are time-barred; (5) After the dismissal of the securities laws claims, the Court should decline to exercise subject matter jurisdiction over the common law claims. Finally, EYB further argues that the plaintiffs have failed to state a claim for controlling person liability.

### 1. *Personal Jurisdiction*

#### a. *Legal Standard*

 The Exchange Act "permits the exercise of personal jurisdiction to the limit of the Due Process Clause ...." *SEC v. Unifund SAL,* 910 F.2d 1028, 1033 (2d Cir.1990).[17] The due process jurisdictional inquiry has two parts, the "minimum contacts" inquiry and the "reasonableness" inquiry. *Metropolitan Life Ins.,* 84 F.3d at 567. The minimum contacts analysis is governed by *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. While *International Shoe* dealt with minimum contacts with the forum state,

> where, as here, the United States, and not the State of New York, is the only sovereign whose power to adjudicate is in question, it logically follows that the relevant 'minimum contacts' ... should be the defendant's contacts with the United States, and not his contacts with the State of New York.

*SEC v. Softpoint, Inc.,* No. 95 Civ. 2951(GEL), 2001 WL 43611, at *3 (S.D.N.Y. Jan. 18, 2001); *see also Chew v. Dietrich,* 143 F.3d 24, 28 n. 4 (2d Cir.1998). Each defendant's contacts with the forum "must be assessed individually." *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

Two types of jurisdiction should be analyzed in determining whether there are sufficient minimum contacts, specific jurisdiction and general jurisdiction.

> Specific jurisdiction exists when "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum"; a court's general jurisdiction, on the other hand, is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts.

*Metropolitan Life Ins.,* 84 F.3d at 567–68 (citing *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 414–16 & nn. 8–9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)); *see also Aerogroup Int'l, Inc. v. Marlboro Footworks, Ltd.,* 956 F.Supp. 427, 439 (S.D.N.Y.1996).

To find specific jurisdiction, the Court must determine that "the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Although courts look to whether it was foreseeable to the defendant that its actions would cause injury in the forum State, the Supreme Court has made clear that foreseeability requires that " 'the defendant's conduct and connection with the forum State are such that he should rea-

---

**17.** The parties incorrectly apply New York law to the personal jurisdiction issue. Where a case is brought pursuant to federal question jurisdiction and "a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules 'if the federal statute does not specifically provide for national service of process.' " *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997) (citation omitted).

sonably anticipate being haled into court there.'" *Id.* at 474, 105 S.Ct. 2174 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). In sum, a defendant must have "'purposefully avail[ed] itself of the privilege of conducting activities within the forum State.'" *Burger King Corp.,* 471 U.S. at 475, 105 S.Ct. 2174 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp.,* 471 U.S. at 475, 105 S.Ct. 2174. *See also Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.,* 98 F.3d 25, 32 (2d Cir.1996).

To find general jurisdiction, the defendant must have "continuous and systematic general business contacts" with the jurisdiction. *Helicopteros,* 466 U.S. at 416, 104 S.Ct. 1868. This is a fact-specific inquiry that requires courts to assess the defendant's contacts "*as a whole.*" *Metropolitan Life Ins.,* 84 F.3d at 570 (emphasis in original). Moreover, "[b]ecause general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test" than that applicable to specific jurisdiction. *Id.* at 568; *see also Aerogroup,* 956 F.Supp. at 439.

The second part of the due process personal jurisdiction test is determining the reasonableness of the exercise of jurisdiction. In undertaking this analysis, the Supreme Court has identified the following factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial

system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Metropolitan Life Ins.,* 84 F.3d at 568 (citing *Asahi Metal Indus. Co. v. Superior Court of California, Solano County,* 480 U.S. 102, 113–14, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)); *see also SEC v. Euro,* 1999 WL 76801, at *3.

■ Finally, pursuant to the doctrine of "pendent personal jurisdiction," a district court can assert personal jurisdiction over parties on related state law claims where "a federal statute authorizes nationwide service of process, and the federal and state claims 'derive from a common nucleus of operative fact'" even where personal jurisdiction is "not otherwise available." *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1056 (2d Cir. 1993) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).

b. *Application to K & W, FASB and EYB*

2. *Minimum Contacts Analysis*

■ K & W, FASB and EYB are alleged to have served as Fund administrators. K & W served as the Administrator beginning in September 1995, pursuant to an agreement signed by Berger and Jan Spiering, President of K & W and Managing Partner of EYB. FASB replaced K & W in February 1997, pursuant to an agreement signed by Berger and Derek Stapley, an EYB principal. These agreements provided that the Administrator would, among other things, maintain records of Fund transactions, disburse payments of the Fund's costs and expenses, collect subscription payments, keep the Fund's accounts and those records required by law, prepare monthly financial statements, file

any necessary tax returns, and allow the Fund's auditor to inspect the register and any other records. Plaintiffs allege that EYB, K & W, and FASB used fictitious statements received from Berger to prepare and disseminate materially inflated NAV calculations to investors, ignoring the accurate financial statements prepared by Bear Stearns.

The plaintiffs have shown through discovery that each of these defendants functions as an integrated member of the international Ernst & Young enterprise. During the period of the scheme alleged in the Complaint, this enterprise sought to develop brand recognition around the world for the name Ernst & Young, to coordinate the work of all the offices, and to market their work with the promise of effectively coordinated international work. EYI organizes the Ernst & Young enterprise from its executive office in New York. It functions as a Member Association. The Articles of Association, adopted in 1997, provide for "coordination and facilitation of the development of global strategies and initiatives ... [and] of investments and resources allocation." Members are urged to "promote an international identity" and to refer work to other Members. The "Member's Pledge" commits each member to market itself as part of an integrated entity capable of providing services around the globe. It reads, in part,

As a Member of Ernst & Young International, Ltd. (the "Company") we have bound ourselves to use our best efforts to carry out the purposes and follow the policies of the Company and to cooperate with the Company. *[Members agree to] prepare regional and country strategic plans that conform to the international plan ... To promote an international identity, including adopting of the Ernst & Young name (wherever permitted by law)* as soon as practicable ... To participate in worldwide initiatives ... to accept a commitment of worldwide resources and the establishment of fees for multinational engagements by multinational-client service executives, with appropriate communication and consultation ... to obtain work for the network of Members, to the extent practicable. (Emphasis added).

Jurisdictional discovery revealed that Ernst & Young is in the process of further integrating its various entities around the world. Jan Spiering, President of K & W and FASB and Managing Partner of EYB, described the integration as a process "to get more of a one firm, centralized firm approach." In March 1999, a "global advertising campaign" was launched in order to further "consistency of brand image." A "knowledge management initiative" aims "to insure as much information as possible is maintained on computers" from which the various Ernst & Young offices can "draw information." In addition, the Ernst & Young Global Site Project, as described in a 1999 Manual, aims to coordinate 35 different web sites in order to "unify the Ernst & Young Web presence to consistently support and build our global brand." The Project Overview cites the importance of a "consistent experience" for the audience such that "[f]rom the moment a person visually identifies our logo to the experience they have working with us, each point of contact we have with our many audiences must sing the same Ernst & Young song." Finally, the Global Exchange Program enables individuals from one global office to relocate temporarily to another office "almost anywhere in the world."

Despite this strong evidence of integration, coordinated from the New York offices of EYI, each of these defendants

argues that it is a foreign entity operating exclusively in Bermuda with no offices, employees or agents in the United States and further points out that it has no bank accounts, is not registered to do business, and pays no taxes in the United States. To the extent that personnel visit the United States, each defendant asserts that it is "on a limited and sporadic informational and solicitation basis." Each of these defendants further argues that its activities in relation to the Fund were "expressly limited and foreign based," in that they signed and performed service agreements outside of the United States, communicated with investors from Bermuda, dealt with bankers and auditors in Bermuda, maintained all record keeping and made all NAV calculations in Bermuda, and met with no investors in the United States. In effect, they ask this Court, in determining whether they have the minimum contacts with this country necessary to assert personal jurisdiction over them, to ignore their integration with a global firm, an integration on which they rely each day both to attract international business and to provide the resources necessary to perform that work.

Through jurisdictional discovery, however, the plaintiffs have established facts supporting a prima facie case that each Bermuda-based Ernst & Young defendant has the minimum contacts with the United States sufficient to support personal jurisdiction. Those facts in summary form include the following.

*FASB*

The plaintiffs have presented prima facie evidence of the existence of general jurisdiction over FASB. FASB provides administrative services principally for funds which are created, managed and operated from the United States. Between 66% and over 90% of FASB's annual revenues derive from funds with United States investment managers. As part of their services as fund administrators, FASB regularly calls investors or their advisors in the United States and sends them materials, including copies of monthly account valuations. Further, FASB's marketing materials emphasize that it has "[a]ccess to EYI's staff support and industry specialists" as well as "direct download connections with U.S. brokers." These facts—which constitute a prima facie showing of continuous and systematic general business contacts with the United States—are sufficient to support a finding of general jurisdiction.

The plaintiffs have also carried their burden of showing specific jurisdiction over FASB. As the Offer Memo described, the Fund was to be available to United States investors, specifically "U.S. entities subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or other entities exempt from U.S. tax," as well as foreign investors. Consequently, FASB sent approximately 80 letters on FASB letterhead with enclosed subscription documents to individuals in the United States soliciting investors for the Fund. As important, FASB signed a contract to serve as the administrator of a Fund which, while technically operating as an offshore-fund, was entirely managed out of New York by Berger. FASB well understood that the "decisionmaking authority was vested in" Berger in New York. *Burger King Corp.*, 471 U.S. at 480, 105 S.Ct. 2174. Berger, through MCM, invested the Fund's assets in United States' securities traded on American exchanges. FASB sent bills to Berger in New York for approval prior to payment by the Fund and received from the United States all of the information from which it prepared the statements it disseminated as Fund administrators. In that role it made countless mailings to investors or to the

agents of investors residing in the United States. Given these activities, it is difficult to imagine how the Fund's administrator would lack the sufficient contacts with the United States to justify finding specific jurisdiction. These facts apply also to the existence of specific jurisdiction over K & W,[18] which FASB replaced in 1997, as the contracted administrator for the Fund, and EYB which, as discussed below, was heavily involved with the Fund through its intertwined relationship with FASB and K & W. None of these entities can credibly assert that the quality and nature of their relationship with the United States, arising out of their work for the Fund, was random, fortuitous or attenuated. *Id.*

### K & W

Although the showing here is substantially weaker, the plaintiffs have also presented prima facie evidence sufficient to support a finding of general jurisdiction over K & W. First, as a fund administrator, K & W regularly calls investors and their advisors in the United States and sends them copies of monthly account valuations as well as other materials. Further, K & W signed the Member Pledge as well as a license agreement with EYI, by which K & W agreed to comply with EYI's rules and procedures, including quality control procedures, and allowed EYI to review its services to ascertain compliance with rules and procedures.[19] Further, K & W held itself out as part of Ernst & Young's international network. For example, in response to Berger's complaints about confusion stemming from faxes bearing the "Ernst & Young" letterhead rather than that of K & W, K & W stated: "My

only mitigating comment in this regard is that [K & W] is part of Ernst & Young's international affiliation." Because of K & W's systematic solicitation of business in the United States, and its dependent and intertwined relationship with EYI, a United States run organization, prima facie evidence exists of continuous and systematic general business contacts with the United States.

### EYB

The plaintiffs have also produced prima facie evidence to warrant a finding of general jurisdiction over EYB. First, EYB regularly sends letters to individuals in the United States with promotional materials, soliciting them as new clients for EYB's offshore administrative service. EYB actively involves itself in the Ernst & Young international network. For example, as part of the Global Exchange Program, it has received two employees from United States offices who were maintained on the US-based payroll. More significantly, roughly 30% of EYB's business is for multinational clients where the overall account relationship is managed by a "global account partner" outside of Bermuda, some of whom are in the United States. The global account partner sets the final fee. When the Managing Partner of EYB serves as the global account partner in Bermuda, he travels to the United States with other EYB personnel for meetings. This has occurred at least five times in the last three years. Another EYB principal indicated in his affidavit that he travels to the United States approximately five times per year to meet with companies which

---

18. In support of specific jurisdiction, the plaintiffs produced through discovery roughly 20 letters on K & W letterhead soliciting investors in the United States for the Fund with enclosed subscription documents.

19. The Pledge was signed: "Kempe and Whittle which also practices as Ernst & Young in Bermuda." The license includes a choice of law provision indicating that the license is "governed by and construed in accordance with the laws of the State of New York, U.S.A."

provide services to clients of EYB, FASB, and K & W and to attend industry conferences. Finally, since at least 50 EYB clients are audited in accordance with U.S. GAAP, EYB regularly consults various Ernst & Young offices in the United States on issues relating to U.S. GAAP, U.S. GAAS, U.S. income taxes, and U.S. securities laws. At least five EYB clients are public reporting companies that file their financial statements with the SEC. In many other cases, an EYB audit is consolidated with another Ernst & Young audit and filed as a consolidated statement with the SEC. These jurisdictional facts constitute continuous and systematic general business contacts with the United States sufficient to support a finding of general jurisdiction.

Finally, although EYB was not named as the Fund administrator, its intertwined relationship with FASB and K & W, and indeed its control of these entities, meant that it had its own significant and direct involvement with the Fund. Discovery revealed that these Bermuda defendants effectively function as a single entity. The Managing Partner of EYB is the President of K & W and FASB; the partners of EYB are the shareholders of K & W and FASB. K & W and FASB share offices with EYB and their employees are on the EYB payroll. The name plate for their common reception area reads only "Ernst & Young." Time and billing systems for the three entities are merged and a combined management report is generated on a monthly basis. Compensation is set by overall performance in the three entities. FASB and K & W identify themselves as interchangeable with or owned by EYB: K & W signed the Member's Pledge as "Kempe and Whittle which also practices as Ernst & Young in Bermuda," and FASB identified itself in two separate documents addressed to Berger as a "Bermuda incorporated company owned by the partners of EYB" and as an "affiliate of EYB."

Despite EYB's contention that it had "no contractual, working or other relationship or connection with the Fund" or with Berger, discovery has shown the opposite. EYB has even identified itself to Berger as the entity in charge of the Fund's work. A letter sent in February 1997, by Spiering in his capacity as Managing Partner of EYB, informed Berger that FASB would replace K & W "as the corporate vehicle through which *we* provide fund accounting and administration services to existing and future clients" and discusses "*our* current services" and "*our* client base" (emphasis added). Discovery has shown numerous telephone calls and correspondence from EYB personnel to Berger in New York as well as four substantive business meetings in New York between Berger and EYB personnel. In February 1995, their joint discussions included the structure of the Fund, services available to clients, and fee negotiations. In a follow-up letter to Berger, an EYB employee emphasized that "our affiliation with Ernst & Young international network allows us to draw on the expertise both within our own Investment Fund Audit teams and the rest of our worldwide offices .... We can also draw on our other offices to assist with staffing requirements should the need arise." At a second meeting in New York in June 1996, the Investment Management Agreement was signed, allowing Berger to make trading and investment decisions on behalf of the Fund, and arrangements were discussed for the direct downloading of information from Bear Stearns in New York to the Ernst & Young computer system in Bermuda. Berger and the EYB representatives again discussed management and incentive fees. Two other New York meetings, in November 1996 and in 1999, included conversations about procedures

and fund administration services as well as requests of information from Berger.

In addition to the meetings in New York, EYB used Ernst & Young personnel in the United States for a variety of tasks related to the Fund. In March 1995, Spiering wrote to an individual in the "New York office," asking him if he knew of Berger or FAM, and whether he was "aware of any reasons which would influence our decision whether or not to accept appointment." In May 1999, EYB personnel requested that the investigative practice group at Ernst & Young in the United States do a review of FAM. In response, a partner at the office of "Ernst & Young, LLP," in Ohio visited the Columbus offices of FAM, and another "Ernst & Young, LLP" employee sent several e-mails to Derek Stapley relating to an investigation of FAM. Taken together, this evidence constitutes prima facie evidence that EYB purposefully directed its activities to residents of the United States such that it should have anticipated being haled into courts of this country to answer on claims arising out of the Fund's operations and its work for the Fund.

### 3. Reasonableness Inquiry

■ K & W, FASB and EYB each argue that subjecting them to personal jurisdiction would be unreasonable because, among other things, jurisdiction would be unduly burdensome and the United States has little or no inherent interest in adjudicating the plaintiffs' claims. Their arguments are unconvincing. New York has a substantial interest in litigating a fraud which was conceived of and managed in New York. The United States has a substantial interest in the enforcement of its securities laws and the protection of investors in United States securities markets, even those who invest through participation in a fund. The

plaintiffs reside in many countries such that the choice of the Southern District of New York for litigation provides both a convenient forum and one with expertise in this kind of litigation. The litigation will not impose undue burden on these defendants, each of whom has substantial contacts with the United States and is part of a global enterprise managed from New York City.

### 4. Subject Matter Jurisdiction

The securities laws are silent regarding the issue of extraterritorial application. In analyzing transnational frauds, courts must determine "'whether Congress would have wished the precious resources of the United States courts' to be devoted to such transactions." *Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir.1991) (quoting *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir.1983)); *see also Carr v. Equistar Offshore, Ltd.*, No. 94 Civ. 5567(DLC), 1995 WL 562178, at *6 (S.D.N.Y. Sept. 21, 1995). The Second Circuit has developed two tests to determine whether the Court should entertain subject matter jurisdiction over a particular transnational securities fraud claim, the conduct test and the effects test. *Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118, 121–22 (2d Cir.1995). The two tests need not be applied "separately and distinctly," and "an admixture or combination of the two often gives a better picture of whether there is ·sufficient United States involvement to justify the exercise of jurisdiction by an American court." *Id.* at 122. Indeed, certain facts, such as making telephone calls or sending investment information to the United States, can be "characterized as either conduct or effects in the United States." *Banque Paribas*, 147 F.3d at 128 & n. 13.

■ The effects test looks to the effect of the fraudulent conduct that "impacts on

'stock registered and listed on [an American] national securities exchange and [is] detrimental to the interests of American investors.'" *Itoba*, 54 F.3d at 124 (citation omitted). The impact on investors resident in the United States, whatever their nationality, is the focus of the effects test. *Banque Paribas*, 147 F.3d at 128 n. 12.

A federal court has subject matter jurisdiction under the conduct test "if (1) the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere, and (2) these activities or culpable failures to act within the United States 'directly caused' the claimed losses." *Itoba*, 54 F.3d at 122 (citations omitted); *see also Banque Paribas*, 147 F.3d at 129 (holding these factors to constitute the "key element" of the conduct test). The goal of the conduct test is to prevent the United States from being "'used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners.'" *Itoba*, 54 F.3d at 122 (quoting *Psimenos*, 722 F.2d at 1045). Consequently, where defendants have undertaken significant steps in the United States in furtherance of a fraudulent scheme, United States courts have jurisdiction over suits arising from that conduct even if the final transaction occurs outside the United States and involves only foreign investors. *Alfadda*, 935 F.2d at 478–79 (citing Restatement (Second) of Foreign Relations Law of the United States § 416(d) (1987)). The Second Circuit has found jurisdiction over a "predominantly foreign" securities transaction where, "in addition to communications with or meetings in the United States, there has also been a transaction on a U.S. exchange, economic activity in the U.S., harm to a U.S. party, or activity by a U.S. person or entity meriting redress." *Banque Paribas*, 147 F.3d at 130.

The plaintiffs have alleged facts sufficient to withstand a motion to dismiss for lack of subject matter jurisdiction. Although the named plaintiffs are foreign citizens, and the Fund operated as an offshore-fund, the fraud was run from the United States and it was the decisions made in the United States that led directly to the investors' losses. Specifically, the plaintiffs allege that the fraud was conceived and executed in New York by Berger, who implemented the scheme through his wholly-owned company, MCM, a Delaware corporation with its principal place of business in New York. The Offer Memo advertises the Fund to "U.S. entities subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or other entities exempt from U.S. tax," among others. Berger's investment strategy principally involved the concentrated short selling on American exchanges of securities of United States technology companies. The Fund's securities transactions were cleared in New York by Bear Stearns and all of the Fund's assets were in Bear Stearns' custody in New York. Berger then prepared the fictitious financial statements, which were sent offshore to the Fund's administrators and auditors, and then re-transmitted back into this country and abroad to prospective investors, current shareholders, and their agents.

The defendants argue that courts cannot aggregate defendants' conduct and look at the scheme as a whole when analyzing subject matter jurisdiction but rather must look to the conduct of each defendant individually. Even were this Court to accept the defendants' argument, the result would be the same. Against EYB, FASB, and K & W in particular, the plaintiffs allege that as the Fund Administrators, these defendants disseminated materially inflated NAV statements to the Fund's sharehold-

ers or to prospective investors, including addresses in the United States, a fact which K & W and FASB concede in their memorandum of law. Jurisdictional discovery revealed that recipients of monthly NAV statements included American residents who invested in the Fund through offshore vehicles but who received their NAV statements in the United States, either directly or through their investment managers. *See Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1338 (2d Cir.1972) (analyzing effect in the United States by looking at beneficial owner rather than off-shore vehicle used to purchase securities). Plaintiffs further allege that in addition to trips from Bermuda to New York for substantive business meetings with Berger, EYB, FASB, and K & W personnel were in regular, often daily, telephone/fax or correspondence contact with Berger seeking approval for NAV calculations, redemption requests, or other matters, or to negotiate additional fees.

5. *Failure to Plead Section 10(b) Claim with Particularity*

Section 10(b) and Rule 10b–5 prohibit fraudulent activities in connection with the purchase or sale of securities. The proscriptions of Section 10(b) and Rule 10b–5 were meant to be broad and inclusive. *See, e.g., SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1466 (2d Cir.1996). To state a cause of action under Section 10(b) and Rule 10b–5, "a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that the plaintiff's reliance on defendant's action caused plaintiff injury." *Rothman,* 220 F.3d at 89 (citation omitted). Securities fraud claims are subject to the pleading requirements discussed above.

 Plaintiffs have adequately alleged a securities fraud claim against EYB, FASB, and K & W. As discussed above, the Complaint alleges that these defendants knowingly and/or recklessly used false data from Berger—despite concurrent receipt of accurate financial statements from Bear Stearns—to prepare inflated NAV statements and disseminate them to plaintiffs who relied upon the information in their investment decisions regarding the Fund and thereby suffered injury. These defendants further used the false NAV figures to process new subscriptions, issue new shares of the Fund, and price investor redemptions. Several examples of specific allegations adequately pleading at the very least reckless behavior on the part of these defendants are detailed in the background discussion and need not be repeated here.

 EYB asserts that because only FASB and K & W signed service agreements with the Fund to serve as administrators, the plaintiffs have failed to specify any statement made by EYB which is alleged to have been misleading and therefore make EYB a primary violator. A primary violator of Section 10(b) is any actor who "participated in the fraudulent scheme." *SEC v. U.S. Envtl., Inc.,* 155 F.3d 107, 112 (2d Cir.1998) (citation omitted). While it is clear from the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 167, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), that private civil liability under Section 10(b) applies only to those who "engage in the manipulative or deceptive practice" and not to those "who aid and abet the violation," a finding that the defendant communicated the misrepresentation directly to the plaintiff is not necessary. It is necessary, however, for the misrepresentation to have

been attributed to the defendant at the time of dissemination. *Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir. 1998). The necessity for this requirement is premised on the plaintiff's obligation to "show reliance on the defendant's misstatement or omission to recover under 10b–5." *Central Bank,* 511 U.S. at 180, 114 S.Ct. 1439.

The plaintiffs have presented documents to support a claim against EYB as a primary violator of Section 10(b). For example, FASB's mailings to investors were on letterhead that read "Fund Administration Services (Bermuda) Ltd., An Affiliate of Ernst & Young, Bermuda." At the bottom of the page, the document explained that FASB "is a company owned by the partners of" EYB. These statements are sufficient to tie EYB to each of the false NAVs disseminated by FASB through such mailings and to justify an investor's reliance on not just FASB but also EYB for the accuracy of the information contained in the mailings. "Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met." *Id.* at 191, 114 S.Ct. 1439 (emphasis in original). To the extent there is insufficient specificity in their first amended complaint, the plaintiffs will be permitted to cure the deficiency.

6. *Statute of Limitations Bar to Section 10(b) Claim against K & W*

■ Securities claims must be brought within one year of discovery of a violation and within three years of the actual violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 360,

111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *Rothman,* 220 F.3d at 96. K & W argues that the plaintiffs' securities law claims against it are time barred because the Complaint was filed more than three years after February 1, 1997, the date on which the Complaint alleges that K & W was replaced by FASB as the Fund's administrator. Plaintiffs assert that because the Complaint alleges both that K & W is part of the single, unified "Ernst & Young" firm and that all of the defendants therefore acted as one entity from the inception through the discovery of the fraud, it is irrelevant for statute of limitations purposes that FASB replaced K & W in 1997.

■ The Second Circuit has treated motions to dismiss based on statute of limitations under the same standard as motions to dismiss for failure to state a claim. *Harris v. City of New York,* 186 F.3d 243, 250 (2d Cir.1999). The plaintiffs have, however, failed to allege any material misrepresentation made by K & W within the statute of limitations period that was relied upon by the investors and have thus failed to allege that K & W was a primary violator of the securities laws after FASB replaced K & W as the Fund's administrator in February 1997. FASB and K & W's motion to dismiss the securities claims against K & W on statute of limitations grounds is granted. Similarly, three of the state law claims alleged against K & W, namely negligence, gross negligence, and professional malpractice, are dismissed based on three year statutes of limitations.

Because the federal claims against K & W have been dismissed, it may be held in this action for common law fraud, aiding and abetting common law fraud, and negligent misrepresentation, all of which have six year statutes of limitations under New

York law,[20] only if the plaintiffs have sufficiently alleged that K & W is amenable to service of process under New York's long-arm statute, in addition to the federal due process test discussed above. *Kernan v. Kurz–Hastings,* 175 F.3d 236, 240 (2d Cir. 1999).

■ The plaintiffs have adequately met their burden under Section 302(a)(1), N.Y. C.P.L.R. (McKinney 1990), whereby a defendant is subject to personal jurisdiction in New York if it "transacts any business within the state" and the cause of action "arises out of" that transaction. *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1109 (2d Cir.1997). A claim "arises out of" a party's transaction of business if it is " 'sufficiently related to the business transacted that it would not be unfair to deem it to arise out of the transacted business,' " *id.* 1109 (citation omitted), that is, if an " 'articulable nexus' " exists between the claim and the transaction, *Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F.3d 151, 153 (2d Cir.1999) (citation omitted), and the defendant has " 'purposefully availed [it]self of the privilege of conducting activities within New York and thereby invok[ed] the benefits and protections of its laws.' " *Fort Knox Music Inc. v. Baptiste,* 203 F.3d 193, 196 (2d Cir.2000) (citation omitted).

■ K & W argues that this Court lacks jurisdiction because its contacts with New York were infrequent. Even if that were true, as discussed in the very case on which K & W relies, it is not the "quantity of contacts with New York, but rather the nature and quality of the contacts" that are the focus of the Section 302(a)(1) analysis. *Lawrence Wisser & Co. v. Slender*

*You, Inc.,* 695 F.Supp. 1560, 1563 (S.D.N.Y.1988). K & W won the right to work as the administrator of the Fund through face-to-face negotiations with Berger in New York. K & W allegedly ignored accurate financial statements received from Bear Stearns in New York and took direction from Berger in New York for a Fund managed in New York and trading securities on New York exchanges. Jurisdictional discovery also produced roughly 20 letters from K & W soliciting Fund investors and/or their agents at New York addresses. It regularly sent NAV statements and other Fund documents to investors or their managers in New York. Looking at the "totality of the circumstances concerning [K & W's] connections to [New York]," *id.,* and given K & W's conduct and connection to New York as discussed earlier in this Opinion, it should reasonably have anticipated being haled into court here.[21] Accordingly, the claims of common law fraud, aiding and abetting common law fraud, and negligent misrepresentation against K & W remain in this action.

### 7. *Section 20(a) Claim: Controlling Person Liability*

■ EYB argues in abbreviated form that the plaintiffs have failed to allege adequately a claim for controlling person liability. To establish a prima facie case of controlling person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), a plaintiff must show:

(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) "that the controlling person was in some meaningful sense a culpable participant" in the primary violation.

---

**20.** The parties have not addressed whether any other jurisdiction's statute of limitations must be considered under New York's borrowing statute.

**21.** As discussed above, the plaintiffs have met their jurisdictional burden against K & W under a due process analysis.

*Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998) (quoting *SEC v. First Jersey,* 101 F.3d at 1472); *see also In re Livent,* 78 F.Supp.2d 194, 221 (S.D.N.Y.1999).

■ The second element, or control over a primary violator, may be established by showing that "the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *SEC v. First Jersey,* 101 F.3d at 1473 (quoting 17 C.F.R. § 240.12b–2); *see also Gabriel Capital, L.P. v. Nat-West Fin., Inc.,* 122 F.Supp.2d 407, 426 (S.D.N.Y.2000). Actual control over the wrongdoer and the transactions in question is necessary for control person liability. *See In re Blech Sec. Litig.,* 961 F.Supp. 569, 586–87 (S.D.N.Y.1997). Thus, officer or director status alone does not constitute control. *See In re Livent,* 78 F.Supp.2d at 221 (collecting cases). A plaintiff "need only plead facts supporting a reasonable inference of control" to survive a motion to dismiss. *Gabriel Capital,* 122 F.Supp.2d at 426–27.

■ The third element—the culpable participation element—is subject to the PSLRA's heightened pleading standard. That is, plaintiffs must "state with particularity facts giving rise to a strong inference that [the controlling person] in some meaningful sense culpably participated in [the controlled person's] primary violation." *Gabriel Capital,* 122 F.Supp.2d at 427. This burden is satisfied if plaintiffs plead facts "giving rise to a strong inference that the controlling person knew or should have known that [the controlled person] was engaging in fraudulent conduct," but "took no steps to prevent the primary violation." *Gabriel Capital,* 122 F.Supp.2d at 428–29.

■ The Complaint adequately alleges both actual control and culpable participation. In particular, the plaintiffs allege that EYB identified FASB and K & W as "the corporate vehicle[s] through which" EYB provided administrative services to its clients and that EYB "owned and controlled" FASB and K & W by exercising "direct, daily supervision, oversight and control" through common personnel and shared offices. Further, the Complaint is peppered with specific allegations of participation by EYB personnel in the fraud including, among other examples noted throughout this Opinion, the preparation of false NAV statements by two EYB personnel alleged to be overseeing administration services for the Fund, and their failure to investigate either the discrepancies between Berger's statements and those received from Bear Stearns or the suspicious appearance of Berger's statements on their face. Accordingly, EYB's motion to dismiss plaintiffs' claim of controlling person liability is denied.

Finally, the motion brought by the three Bermuda entities pursuant to Rule 12(e) for a more definite statement is granted. Any amended pleading must identify the specific defendant or defendants against whom an allegation is being made, and may not rely on collective assertions.

## C. EYI

EYI moves to dismiss the actions pursuant to Rules 9(b) and 12(b)(6).[22] EYI argues that the Cromer plaintiffs fail to state a claim for a violation of federal securities law as either a primary violator or under a theory of controlling person liability. In particular, EYI argues that the plaintiffs have attempted to hold it liable through a

---

**22.** EYI initially moved for both dismissal and summary judgment. In its reply brief, however-

er, EYI limited its motion to the dismissal arguments.

"single, unified company" theory, grouping EYI with EYB, FASB, and K & W and ignoring the "separate legal identity" of EYI. EYI argues that it is not a professional services firm which provides accounting, auditing or other professional services to clients, but rather a "membership association" of separately organized accounting firms throughout the world which agree to conduct their individual practices in accordance with EYI's Articles of Association. Finally, EYI argues that the Court should not exercise jurisdiction over the pendent claims should the federal securities claims be dismissed.

### 1. *Federal Claims*

The plaintiffs have failed to state a claim against EYI for securities fraud. First, the plaintiffs have failed to state a claim for securities fraud as a primary violator. As discussed above, a secondary actor may be held liable for securities fraud where "the misrepresentation [is] attributed to that specific actor at the time of public dissemination, that is, in advance of the investment decision," *Wright,* 152 F.3d at 175. While the plaintiffs have alleged that EYI was part of the global Ernst & Young enterprise, the sole allegation linking EYI to this fraud was the

Offer Memo's indication that FASB or K & W, the identified administrators of the Fund, were "affiliates of EYI." That alone is not sufficient to connect EYI to the dissemination of false statements by FASB or K & W.[23] Unlike EYB, there was no reference to EYI in the documents in which the false statements were contained. Accordingly, EYI's motion to dismiss the Section 10(b) claim against it is granted.

The elements of a prima facie case of controlling person liability are discussed above. The plaintiffs have failed to allege "culpable participation" by EYI with the particularity required under the law. The plaintiffs point to the Complaint's allegations that an e-mail sent in February 1999, from a DTB partner to a DTUS partner stated: "Having spoken to the Administrator (it is Ernst & Young Fund Administration Company) here in Bermuda. Off the record, the Administrator advised that they had heard something similar [about fraudulent conduct] via an U.S. Ernst & Young Partner." This allegation is insufficient to support a "strong inference" that *EYI* knew or should have known that the other Ernst & Young defendants were engaging in fraud. The plaintiffs' claim for

---

**23.** Plaintiffs argue that, in the alternative, EYI may be held liable for securities fraud through a piercing-the-veil theory. Even if this theory remains valid in the aftermath of *Central Bank,* the plaintiffs have not alleged facts sufficient to hold EYI liable under this theory. Under New York law, plaintiffs may pierce the corporate veil where they show: " '(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; *and* (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil.' " *Thrift Drug, Inc. v. Universal Prescription Adm'rs,* 131 F.3d 95, 97 (2d Cir. 1997) (emphasis in original) (citation omitted). Complete domination has been found where the dominated company held no shareholder meetings, maintained no records of

directors' meetings, was inadequately capitalized, or lent money to the dominated company without corporate purpose, or where the dominated company/individual was the sole shareholder and director of the dominated company. *Id.* Using domination to commit fraud has been interpreted to require a showing that "the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene." *Id.* While the plaintiffs have alleged that Ernst & Young operated as a global, financially interdependent enterprise and that EYI provided executive management and strategic direction for its members, it has not alleged that FASB, K & W or EYB lacked any corporate form or that EYI used its control to perpetrate a fraud.

controlling person liability against EYI is dismissed.

### 2. *State Law Claims*

■ EYI argues that without a claim of federal securities fraud, the plaintiffs' state claims against EYI should be dismissed for lack of jurisdiction, or alternatively for failure to state a claim under Rule 12(b)(6) and, for claims sounding in fraud, for failure to meet Rule 9(b) pleading requirements. Where no federal claims exist against a defendant, the Court may nonetheless exercise jurisdiction over a pendent state claim, where

> [t]he state and federal claims ... derive from a common nucleus of operative fact. If, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then there is power in federal courts to hear the whole.

*Baylis v. Marriott Corp.,* 843 F.2d 658, 664 (2d Cir.1988) (quoting *United Mine Workers,* 383 U.S. at 725–26, 86 S.Ct. 1130). Even where the sole defendant with federal claims against it is dismissed from the case, the court still has power to exercise supplemental jurisdiction over the state claims against remaining defendants, provided the state and federal claims derive from a common nucleus of operative fact. *Mizuna, Ltd. v. Crossland Federal Sav. Bank,* 90 F.3d 650, 657 (2d Cir.1996).

Here, the plaintiffs' surviving federal claims against other defendants and state claims against EYI derive from a common nucleus of operative facts. They each stem from the preparation and dissemination of the Fund's allegedly fraudulent NAV statements. The plaintiffs, however, fail to allege adequately their state law claims against EYI.

■ The plaintiffs have asserted seven state law claims against EYI: common law fraud, negligence, gross negligence, professional malpractice, negligent misrepresentation, aiding and abetting common law fraud and aiding and abetting breach of fiduciary duty. The Complaint contains no specific allegations as to the conduct of EYI—apart from the inadequate, generalized references to the "Ernst & Young Defendants"—necessary to give rise to any of the elements of their state claims. Further, the plaintiffs have failed to state their claims under an agency theory.

■ Under New York law, "an agent must have authority, whether apparent, actual or implied, to bind his principal." *Merrill Lynch Interfunding, Inc. v. Argenti,* 155 F.3d 113, 122 (2d Cir.1998). Actual authority "arises from a manifestation from principal to agent." *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc.,* 758 F.Supp. 908, 919 (S.D.N.Y.1991); *see also Empire Communications Consultants, Inc. v. Pay TV,* 126 A.D.2d 598, 510 N.Y.S.2d 893, 895 (2d Dep't 1987). The consent for actual authority may be "either express or implied from 'the parties' words and conduct as construed in light of the surrounding circumstances.' " *Carte Blanche,* 758 F.Supp. at 919 (quoting *Riverside Research Inst. v. KMGA, Inc.,* 108 A.D.2d 365, 489 N.Y.S.2d 220, 223 (1st Dep't 1985)).

■ For apparent authority to exist, there must be " 'words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction' " on behalf of the principal. *Standard Funding Corp. v. Lewitt,* 89 N.Y.2d 546, 656 N.Y.S.2d 188, 191, 678 N.E.2d 874 (1997) (quoting *Hallock v. State,* 64 N.Y.2d 224, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178 (1984)). "In such circumstances, the third party's reasonable

reliance upon the appearance of authority binds the principal." *Id.; see also Marfia v. T.C. Ziraat Bankasi,* 100 F.3d 243, 251 (2d Cir.1996).

A related equitable estoppel doctrine can also bind the principal where the third party reasonably relies on the principal's knowing misrepresentations. *Cinema N. Corp. v. Plaza At Latham Assocs.,* 867 F.2d 135, 141 (2d Cir.1989). Similarly, the principal can be deemed to ratify an unauthorized transaction after the fact "where the principal retains the benefit ... with knowledge of the material facts." *Standard Funding Corp.,* 656 N.Y.S.2d at 191, 678 N.E.2d 874; *see also New Haven Radio, Inc. v. Meister (In re Martin–Trigona),* 760 F.2d 1334, 1341 (2d Cir.1985).

The Complaint alleges no facts to support the existence of actual authority bestowed upon the Bermuda entities by EYI. While the Complaint points to a letter indicating that K & W and FASB functioned as the "corporate vehicle[s] through which" EYB and EYI provided administrative services to its clients, the letter itself, incorporated in the Complaint by reference, identifies only EYB, not EYI. Specifically, its heading reads "Ernst & Young" accompanied by a Bermuda address and it is signed by a managing partner of EYB. The conclusory allegations that the entities "are each agents and/or mere departments of the other," that EYI "owned and controlled [EYB], FASB, and [K & W]," and that EYI's "office in Bermuda is defendant [EYB]" are insufficient to allege actual authority.

The plaintiffs also fail to allege adequately apparent authority. The Complaint alleges that the four Ernst & Young defendants "held themselves out" as a single global entity but do not specify any express or implied communication by EYI to third parties giving the appearance that the Bermuda entities were acting on behalf of EYI as Fund administrator. The plaintiffs argue that investors understood from the Offer Memo that "an affiliate of Ernst & Young International" would provide services for the Fund. The Offer Memo, however, was a communication by the Fund to the investors, not from EYI to investors. While the plaintiffs do allege a common marketing and advertising scheme in the name of "Ernst & Young," including a global website at "www.ey.com," they do not allege that this advertising scheme was orchestrated by EYI. Even if it were, however, the allegation of a general advertising scheme is not sufficient to create the appearance of authority for EYB, FASB, or K & W to act for EYI as the Fund's administrator.

The only New York case cited by the plaintiffs, *Fogel v. Hertz Int'l, Ltd.,* 141 A.D.2d 375, 529 N.Y.S.2d 484 (1st Dep't 1988), involved not only a general advertising scheme by the principal, in this case Hertz, but also the making of a reservation through Hertz and the identification of Hertz on the agent's contract with the plaintiff. *Id.* at 485. Other cases cited by the plaintiff also involve more than the advertising that is alleged in the Complaint. In *Wood v. Holiday Inns, Inc.,* 508 F.2d 167 (5th Cir.1975), Holiday Inns, Inc. exercised such control over the appearance and operation of its franchisee that there was "virtually no way [the plaintiff] could have known that the servants in the [local] facility were servants of [the francishee], not of Holiday Inns, Inc." *Id.* at 176. In *Gizzi v. Texaco, Inc.,* 437 F.2d 308, 310 (3d Cir.1971), in addition to national advertising by Texaco, Texaco exercised control over the local service station and the Texaco insignia and slogan were "prominently

displayed" there.[24]

 The plaintiffs also fail to allege sufficiently the state common law claims against EYI under a partnership by estoppel theory. Pursuant to Section 27 of New York's Partnership Law, when

> a person by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, *as a partner in an existing partnership* . . . , he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership.

(emphasis supplied). *See also Milano v. Freed*, 64 F.3d 91, 98 (2d Cir.1995). A corporation may be held liable under Section 27. *Ranieri v. Leavy*, 180 A.D.2d 723, 580 N.Y.S.2d 366, 367 (1992). A person has "given credit" to the partnership not only where he has "extended financial credit, but also [where he] has relied on another party's representations regarding the existence of a partnership." *Four Star Capital Corp. v. Nynex Corp.*, 183 F.R.D. 91, 105 (S.D.N.Y.1997).

The plaintiffs have alleged that, together with EYB, FASB, and K & W, EYI is part of a "unified global pro[f]essional services firm" which "function[s] essentially as a global partnership." The Complaint alleges that this partnership is "financially interdependent," globally allocates certain revenues and expenses, shares clients, abides by common operational policies, and uses one another to render services in other jurisdictions. Through common

marketing and advertising, Ernst & Young is alleged to represent itself to the public as a unified firm. Further, according to the Complaint, the Offer Memo led investors to believe that they were dealing with an "affiliate of [EYI]." An affiliate, however, is not necessarily a partner. These allegations are insufficient to allege either that EYI represented itself or consented to another representing it as a "partner in an existing partnership" with any of the Bermuda entities, or that the investors "gave credit" to any representations of partnership in making decisions regard to the Fund. Accordingly, EYI's motion to dismiss the entire Complaint against it is granted.

## D. DTB

DTB moves to dismiss these actions pursuant to Rules 12(b)(1), (b)(2) and (b)(6). DTB makes the following arguments: (1) This Court lacks personal jurisdiction over DTB because DTB does not engage in continuous and systematic business in the United States, did not have sufficient contact with the United States in connection with the Fund, and cannot be subject to jurisdiction by virtue of its relationship with DTUS and DTT; (2) This Court lacks subject matter jurisdiction because the Exchange Act does not apply to activities occurring outside of the United States with only a tangential effect inside the United States; and (3) New York choice of law requires this Court to apply Bermuda law to the plaintiffs' claims of aiding and abetting common law fraud and gross negli-

---

**24.** The plaintiffs also cite cases where customers were "led to believe" through logos or advertisements that they were dealing with the principal. *See Drexel v. Union Prescription Ctrs., Inc.*, 582 F.2d 781, 795 (3d Cir. 1978); *Momen v. United States*, 946 F.Supp. 196, 203 (N.D.N.Y.1996). These cases, however, involved logos or advertisements at retail locations or on products. The Cromer plaintiffs do not allege that EYI's logo appeared on any NAV statements disseminated by the Bermuda entities. Allegations that specific letters went out on "Ernst & Young" letterhead are insufficient. Many of those documents are incorporated by reference into the Complaint, all of which reveal letterhead that reads "Ernst & Young" accompanied by a Bermuda address.

gence, under which these claims do not exist.

### 1. *Personal Jurisdiction*

DTB served as the Fund's auditor. Pursuant to the engagement letter signed for each of the years 1996–1999, "Deloitte & Touche" agreed to audit the Fund "to evaluate the fairness of presentation of the statements in conformity with the accounting principles generally accepted in the United States of America." The plaintiffs allege that while DTB issued "clean" reports each year, the audits were materially inaccurate and were issued without reasonable assurances that the Fund's financial statements were free of material misstatements.

Before discussing the jurisdictional facts as they relate to DTB individually, it should be noted that DTB functions as an integrated member of the international Deloitte & Touche enterprise. DTB is a "member firm" of DTT, a Swiss Verein with executive offices in New York. The "Articles of the Verein," dated October 1999, detail the Verein's purposes, including,

> to further international alignment, cooperation, and cohesion among the Member Firms; to assure that Member Firms' practices conform to professional standards of the highest quality; to advance the international and national leadership of the Member Firms in rendering Professional Services; to foster the shared beliefs, mission, and common vision for the Member Firms.

The Articles direct Member Firms to "align national plans, strategies, businesses, and operations with global plans, strategies, business, and operations" and to contribute toward the Verein's operating expenses and "make every reasonable effort" to refer business to other Member Firms. The Verein's Board of Directors is to address "global strategies [and] major transactions" and to "determine the major policies of the Verein." The CEO is invested with the duty of "setting [the Verein's] strategic course" and reviewing and consolidating Member Firms' business and operating plans as well as with reviewing Member Firms' partner compensation processes in order to "ensure consistency with global strategies and goals." If a Member Firm withdraws or is expelled from the Verein, it must "cooperate ... in arranging for the orderly transfer of clients from which it was the receiving Member Firm to another Member Firm." Discovery revealed that over 50% of DTB's business constitutes such "received" business.

DTT's "Globalization Prospectus," dated April 1999, discusses the goal of becoming a "true global firm." It describes the integration process as "evolutionary," having begun in 1989, and proceeding through stages. In a section entitled "Economic Interdependence," the prospectus discusses how aligned practices will "participate in global cost-savings programs to capture savings and facilitate greater uniformity and compatibility throughout the global firm." DTB signed a Global Alignment Resolution in April 1999, pledging to "transform our international organization into a truly global firm."

Finally, a press release issued in December 1999, on the DTT website (www.deloitte.com) counted "advancing its globalization strategy" as one of the "key factors contributing to Deloitte's growth in 1999," and touted its own "seamless, consistent services wherever our clients operate." On a 1999 copyrighted version of its website (www.bermuda.bm), DTB describes itself as "the Deloitte Touche Tohmatsu practice in Bermuda" and boasts of "more than 90,000 people in over 130 countries" delivering "seamless, consistent services wherever our clients operate."

DTB argues that it is not subject to personal jurisdiction because it has no office, telephone number or mailing address in the United States, is not authorized to do business in the United States, and has no bank account, pays no taxes and owns no property in the United States. DTB further argues that its personnel travel infrequently to the United States in connection with client work and render services almost entirely in Bermuda.

In addition to evidence of DTB's participation in the worldwide DTT Verein, however, the plaintiffs have offered additional facts in support of a finding of general jurisdiction. DTB partners, for example, travel to the United States for business-related meetings.[25] At least 50% of DTB's work is for "exempt companies," which are majority-controlled by another company located outside of Bermuda. Over 50% of those exempt companies are located in the United States. DTB audits a captive insurance company located in Bermuda for DTUS' clients and passes the audit to DTUS, which consolidates it with the parent corporations' financial statements and files the papers with the SEC. Further, U.S. GAAS mandates that an auditor have an actuary under the auditor's control to review reserves. Until 1998, DTB had no actuary on staff and "most often" used DTUS for those services. Even after hiring an actuary, DTB has continued to use DTUS actuaries. Based on bills for actuarial consulting and other services, the plaintiffs represent that between 1997 and 2000, DTUS billed DTB over $350,000 for

actuarial services and over $2.5 million for substantive services, such as assistance in common control presentations, tax consultation, and consultation regarding financial statements. As a member of the Verein, DTB was required to participate in a practice review which was conducted by a "team leader" located in Wilton, Connecticut. DTT acts as a purchasing agent for DTB for such things as office supplies, subscriptions, conferences, and software licenses, and DTB uses telephone-based technical support in Wilton, Connecticut, for U.S. GAAP and U.S. GAAS assistance. Finally, DTB regularly solicits business from the United States. The solicitation letter sent to Berger was a "template" used for solicitation of "Bermuda-domiciled funds that had U.S. investment managers." It is unnecessary, however, to decide whether this is prima facie evidence of continuous and systematic general business contacts with the United States, since the plaintiffs have made such a showing in support of a finding of specific jurisdiction over DTB.

■ For many of the same reasons discussed in connection with the parallel motion by the Bermuda-based Ernst & Young entities, the work for the Fund was tied directly to Berger in New York, and impacted United States residents, among others. DTB sent its "Proposal of Professional Services" to Berger in New York. The proposal identified "Deloitte & Touche" as "part of Deloitte Touche Tohmatsu International" with partners and offices worldwide. While DTB argues that

---

**25.** According to DTB materials sent to Berger, Bill Jack, a "Deloitte & Touche" partner in Bermuda, "regularly attends international conferences and is in constant contact with our network of Investment company specialists in the U.S. to ensure that we are abreast of current developments in the industry." Another partner of "Deloitte & Touche" in Bermuda regularly travels to Miami for meet-

ings of partners assigned to the Deloitte Latin American, Caribbean Regional Organization within DTT, of which DTB is a part. He also attended a "Best Practices" meeting in New York in 1997, between smaller Deloitte entities and DTT representatives, as well as an annual world meeting of Member Firms in San Francisco in 1998.

it did not receive the various financial statements it used to complete the audits directly from Berger or Bear Stearns but rather from FASB, DTB was using information it knew emanated from the United States to prepare its allegedly fraudulent audit reports. To perform its work, DTB relied in part on help from its United States based affiliates, who gathered information to mark the Fund's securities to market. DTB next argues that it sent its audits to FASB for dissemination to shareholders, and did not directly mail any of them to the United States. The Offer Memo, however, promised that "Deloitte & Touche," located at a Bermuda address, would be the Fund's independent auditors and explained that the Fund would be marketed to certain classes of United States investors, among others. The audits DTB prepared for the Fund, which the plaintiffs allege contained material misrepresentations about the Fund's financial health, are addressed to "the Shareholders of the Manhattan Investment Fund Ltd." DTB understood that its allegedly fraudulent audits would be mailed to the Fund's shareholders and would reach United States residents. To ignore this reality and focus exclusively on which entity placed the envelope in the mailbox would only serve to elevate form over substance. Finally, the Complaint alleges that a DTB partner spoke with and e-mailed a DTUS partner in February 1999, about a report from Bear Stearns regarding discrepancies in the Fund, and discovery revealed records of phone calls from DTB personnel to FAM and Berger in December 1999, just after the SEC commenced its investigation of the Fund in November 1999, and shortly before Deloitte withdrew its audit reports for 1996–1998 in January 2000. Also in December

1999, at least one DTB partner traveled to meet with Berger in New York to investigate the Fund. While these activities, occurring as they do at the very end of the alleged fraud, would not by themselves create jurisdiction, they do serve to underscore DTB's understanding from the beginning of its work that it was serving a fund managed entirely from New York. Taken together, these facts constitute prima facie evidence of Fund-connected activity purposefully directed at the United States. Again, as with the Ernst & Young Bermuda-based entities, DTB would be hard-pressed to argue that its relationship with the United States, or even with New York state, arising out of its work auditing the Fund, was random, fortuitous or attenuated. *Burger King Corp.*, 471 U.S. at 480, 105 S.Ct. 2174.

### 2. Subject Matter Jurisdiction

The law governing subject matter jurisdiction is discussed above, as are the fraud's connection to the United States and DTB's communications with the United States. The plaintiffs have alleged facts adequate to find subject matter jurisdiction over DTB under the conduct and effects test.

### 3. Aiding and Abetting Common Law Fraud & Gross Negligence Claims

DTB argues that Bermuda law applies to the claims of aiding and abetting common law fraud and gross negligence and that Bermuda law does not recognize such causes of action.[26] Plaintiffs contend that under a choice of law analysis, New York law governs.

In addressing choice of law rules in a federal question case, the court should

---

**26.** Claims of aiding and abetting common law fraud and gross negligence are brought only

by the Cromer plaintiffs.

invoke federal common law choice of law analysis only where "significant federal policy, calling for the imposition of a federal conflicts rule, exists." *In re Gaston & Snow*, 243 F.3d 599, 2001 WL 266058, at *6 (2d Cir. Mar. 19, 2001). The need for uniformity is not, by itself, a sufficient justification for "displacing" state choice of law rules. *Id.* Accordingly, New York choice of law analysis governs this action.

■■■ New York first analyzes whether there is a conflict between the laws of the states. *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998). If there is, New York undertakes a choice of law analysis. *Id.* The plaintiffs and DTB have submitted evidence regarding Bermuda law. Bermuda, a common law jurisdiction, apparently has no authority directly addressed to the common law negligence and fraud claims asserted here, but would follow British law and to a lesser extent United States law. Based primarily on an analysis of British precedent, and the degree to which Bermuda courts adhere to it, it appears that there would be liability under Bermuda law for a claim of negligence against DTB for their audits of the Fund if the plaintiff alleged that DTB knew that its audits would be communicated to the plaintiffs individually or as an identifiable class in connection with a specific transaction, such as, an investment in the Fund, and also knew that those audits would very likely be relied upon by those persons in deciding whether to engage in the transaction. A claim for aiding and abetting fraud would only survive in Bermuda if the pleading alleged that DTB had conspired with Berger or procured or induced his fraud or that DTB joined in the common design of the fraud, none of which is alleged here. It is necessary, therefore, to perform a choice of law analysis for at least the claim that DTB aided and abetted the fraud.

New York law employs an "interest analysis" in choice of law analysis of tort claims, under which courts apply "the law of the jurisdiction having the greatest interest in the litigation." *Curley*, 153 F.3d at 12 (applying New York law). The significant contacts are generally the parties' domiciles and the locus of the tort. *Id.* In particular, for claims based on fraud, a court's "paramount" concern is the locus of the fraud, that is, " 'the place where the injury was inflicted,' as opposed to the place where the fraudulent act originated." *Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146, 1150 (S.D.N.Y.1989) (citing *Sack v. Low*, 478 F.2d 360, 365–66 (2d Cir.1973) (interpreting New York law)). The place in which the injury is deemed to have occurred "is usually where the plaintiff is located." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Limited*, 85 F.Supp.2d 282, 292 (S.D.N.Y.2000) (citation omitted).

DTB argues that Bermuda law should govern because the Cromer plaintiffs as well as DTB are domiciled outside the United States and the locus of DTB's alleged torts is Bermuda. The Cromer plaintiffs contend that because a number of countries have limited and dispersed contacts with the fraud, the Court should apply New York law as the jurisdiction where the fraud originated and where substantial activities in furtherance of the fraud were committed. This Court agrees that New York law should be applied.

Because the Cromer plaintiffs are domiciled in the British Virgin Islands and the Netherland Antilles, injury has occurred in locations with only limited connection to the conduct at issue, while a substantial portion of the fraudulent conduct has occurred in New York. DTB's actions were in furtherance of a fraud created and perpetuated in—with its "locus" in—New York. DTB's audit reports were based on

financial information emanating from New York and were disseminated to Fund shareholders in many countries, including shareholders who either resided in the United States or whose affairs were managed from the United States. Finally, as discussed above, jurisdictional discovery revealed DTB to be a member of an international verein whose global strategy and policies are set in New York. DTB relies on its membership in the verein to generate business, submits to review by the verein, and the logo of the verein's leader, DTT, appeared on each of DTB's audit reports for the Fund. While it is true, as DTB argues, that Bermuda has an interest in regulating the conduct of its domiciliary, New York also has a strong interest in regulating the conduct of an entity which relies in its marketing and in the performance of its work on the implicit representation that it has conformed its conduct to the standards set in New York at the executive offices of the verein. Given the extent to which DTB's business course is determined by decisions made in New York, it is appropriate to apply New York law to these claims. DTB does not contend that the Complaint's state law causes of action are deficient when analyzed under New York law.

### E. DTT

DTT argues that plaintiffs have failed to state a claim for violation of Section 10(b), for controlling person liability, and for the common law claims of common law fraud, aiding and abetting common law fraud and breach of fiduciary duty, gross negligence, negligence, and professional malpractice.[27]

#### 1. Federal Claims

DTT argues that the plaintiffs have failed to allege adequately that DTT itself is a "primary violator" of Section 10(b) and, in light of the Supreme Court's decision in *Central Bank N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), cannot rely on allegations against "Deloitte" generally to hold DTT individually liable for securities fraud claims. DTT is correct.

The Cromer Complaint alleges that the audit reports materially misrepresented the financial condition of the Fund, that DTT's name and logo were affixed to the audit reports "in knowing or reckless disregard that such audit reports were materially false or misleading and/or omitted to state material facts necessary in order to make the statements made ... not misleading," that the plaintiffs would not have purchased the securities of the Fund had they known the audit reports were false, and that they were thereby damaged. While the Complaint does allege that "DTT affixed its name and logo to the audit reports," this conclusory statement is not asserted as a factual allegation but as a legal conclusion.

The plaintiffs have not alleged that DTT knew that the audit reports contained false information, and their allegations are insufficient to infer that DTT was reckless. The Complaint does not allege that DTT was even aware of the reports, much less aware that its name and logo were included on the audit reports. There are no allegations that it failed to review or check information that it had a duty to monitor, that it was aware of any danger that the audit reports included misleading information, or that it was on notice of such a danger. *See Novak*, 216 F.3d at 308. The use of DTT's name on the audit

---

**27.** The claims of gross negligence, negligence, and professional malpractice are asserted only by the Cromer plaintiffs.

reports was undoubtedly of great importance to investors, providing a well-respected international organization's imprimatur on the audits and lending credence to the work of a small, relatively unknown Bermuda entity. Nonetheless, the use of a defendant's name on a document containing misleading information is, by itself, insufficient to constitute scienter. In the absence of sufficient allegations of scienter, DTT's motion to dismiss the securities fraud claims is granted. For these same reasons, the plaintiffs have failed to allege adequately that DTT was a "culpable participant" in the primary violation and the Section 20(a) claim must be dismissed.

### 2. State Law Claims

#### a. Common Law Fraud

The elements of common law fraud under New York law are "essentially the same" as those required to state a claim under Section 10(b) and Rule 10b-5. *Gabriel Capital*, 122 F.Supp.2d at 425–26 (citation omitted). The elements of a fraud claim under New York law are as follows: (1) defendant made "a material, false representation;" (2) defendant intended to defraud the plaintiff thereby; (3) plaintiff reasonably relied upon the representation; and (4) plaintiff suffered damage as a result of the reliance. *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir.1999) (citation omitted). Because plaintiffs have failed to allege an intent to defraud, DTT's motion to dismiss the common law fraud claim is granted.

#### b. Aiding and Abetting Common Law Fraud & Aiding and Abetting Breach of Fiduciary Duty

The elements required to state a claim for aiding and abetting common law fraud or breach of fiduciary duty are listed above. DTT does not dispute the existence of an underlying fraud or breach of fiduciary duty. Rather, it contends that plaintiffs have not adequately alleged the knowledge and substantial assistance/participation elements.

To satisfy the knowledge requirement of these claims, New York law requires that a defendant have "actual knowledge" of the underlying fraud.[28] *A.N. Wight*, 219 F.3d at 91 (noting that New York law requires "knowledge of the underlying wrong" for claims of aiding and abetting fraud and breach of fiduciary duty); *see also Renner v. Chase Manhattan Bank*, No. 98 Civ. 926(CSH), 2000 WL 781081, at *6 (S.D.N.Y. June 16, 2000) (fraud); *Kolbeck*, 939 F.Supp. at 246 (fiduciary duty). The defendant's knowledge and intent, however, need only be "averred generally." *A.N. Wight*, 219 F.3d at 91 (citing Rule 9(b), Fed.R.Civ.P.). A plaintiff satisfies the scienter pleading requirement where it identifies "circumstances indicating conscious behavior by the defendant," *Dreieck Finanz AG v. Sun*, No. 89 Civ. 4347(MBM), 1990 WL 11537, at *4 (S.D.N.Y. Feb. 9, 1990) (quoting *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987)), or a clear opportunity and a motive to aid the fraud, *A.N.*

---

**28.** Plaintiffs argue that the knowledge requirement is satisfied with a lesser standard, such as recklessness. The cases relied upon, however, seem largely to be based on claims of aiding and abetting *securities fraud*, which is no longer viable in light of the Supreme Court's decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 167, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). *See Kolbeck*, 939

F.Supp. at 246–47 (collecting cases). The plaintiffs also rely on *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 283 (2d Cir.1992), which premised its knowledge discussion on federal common law and ERISA law. *See Kolbeck*, 939 F.Supp. at 246 (noting that the *Diduck* rule of constructive knowledge does not apply to cases under New York common law).

*Wight,* 219 F.3d at 92 (New York law). Ordinary economic motive, however, is insufficient to support the latter alternative. *Primavera Familienstiftung v. Askin,* 173 F.R.D. 115, 127–28 (S.D.N.Y.1997) (citing *Shields,* 25 F.3d at 1130). The plaintiffs have failed to plead that DTT had actual knowledge of the fraud.

■ The plaintiffs have also failed to allege adequately the aiding and abetting claims under a partnership by estoppel theory. The law of partnership by estoppel is discussed above. The plaintiffs have alleged that DTT is part of a "single unified global professional services firm" operating under the name "Deloitte & Touche" and functioning as a "global partnership." The various Deloitte offices are "financially interdependent," reporting assets and liabilities together, globally allocating certain revenues and expenses, using other Deloitte offices as agents for various services, abiding by common operational policies, and engaging in quality cross-checks of one another. Through a common marketing and advertising scheme, the Deloitte entities portray themselves as a unified multinational practice. While the Complaint further alleges that each audit report displayed the DTT logo as well as "Deloitte & Touche," it fails to allege either that DTT or anyone with its consent represented that DTT was a "partner in an existing partnership" with DTB, or that investors "gave credit" to any such representations in making their investment decisions. Accordingly, DTT's motion to dismiss the aiding and abetting claims is granted.

c. *Negligence, Gross Negligence and Malpractice*

■ Under New York law, a prima facie case of negligence, gross negligence,

or professional malpractice requires the plaintiff to show: (1) a duty to the plaintiff; (b) a breach of duty; (c) "a reasonably close causal connection between the contact and the resulting injury;" and (d) "actual loss, harm or damage." *Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.,* 113 F.3d 296, 299 (2d Cir.1997) (negligence); *see Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 15 (2d Cir. 2000) (noting that New York law labels professional malpractice a " 'species of negligence' ") (citation omitted); *Renner,* 2000 WL 781081, at \*21 (negligence); *Scone Invs., L.P. v. American Third Mkt. Corp.,* No. 97 Civ. 3802(SAS), 1998 WL 205338, at \*10 (S.D.N.Y. Apr. 28, 1998) (negligence). To constitute gross negligence, " 'the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care.' " *Curley,* 153 F.3d at 13 (citation omitted). That is, gross negligence " 'is conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.' " *Id.* (citation omitted).

■ The Second Circuit has held that plaintiffs alleging negligent misrepresentation[29] under New York law against a professional with whom they have no contractual relationship—and thus no privity giving rise to a duty—must establish the following elements: "(1) the accountant must have been aware that the reports would be used for a particular purpose; (2) in furtherance of which a known party was intended to rely; and (3) some conduct by the accountant 'linking' him or her to that known party." *Securities Investor Protection Corp. v. BDO Seidman,*

---

**29.** While the plaintiffs do not specifically allege negligent misrepresentation against DTT, the substance of their negligence-related claims is that DTT's negligent conduct led to audit reports which misrepresented the Fund's financial condition.

*LLP,* 222 F.3d 63, 73 (2d Cir.2000); *see also Vanguard Mun. Bond Fund, Inc. v. Cantor, Fitzgerald, L.P.,* 40 F.Supp.2d 183, 190 (S.D.N.Y.1999). Plaintiffs are "known parties" if they are members of " 'a known group possessed of vested rights, marked by a definable limit and made up of certain components.' " *Securities Investor Protection Corp.,* 222 F.3d at 74 (citation omitted). An accountant owes a duty of care for services relied upon by plaintiffs who are part of a specific and identifiable group rather than " 'a faceless or unresolved class of persons.' " *Id.* (quoting *White v. Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315, 318–19 (1977)).[30] Conduct constitutes "linking conduct" if it is "some form of direct contact between the accountant and the plaintiff, such as face-to-face conversation, the sharing of documents, or other 'substantive communication' between the parties." *Id.* at 75 (citation omitted).

 There was no privity between DTT and the plaintiffs, and as already discussed, no allegation that DTT even knew that its name and logo were used on the specific audit reports at issue here. Consequently, there was no substantive communication between DTT and the investors to constitute conduct linking DTT

to an identifiable class of persons. DTT's motion to dismiss is granted.[31]

## F. DTUS

DTUS moves to dismiss the securities fraud claim as well as each of the state law claims brought against it for failure to state a claim. The elements necessary to state a cause of action for securities fraud are discussed above. The plaintiffs have not alleged that DTUS made any misstatements on which they relied. As such, DTUS' motion to dismiss the securities fraud claim is granted.[32]

The standards for adequately pleading the state law claims against DTUS are discussed above. The plaintiffs' common law fraud claim suffers from the same infirmities as their Section 10(b) claim. Again, plaintiffs have failed to allege any misrepresentation by DTUS upon which they reasonably relied. Nor have plaintiffs succeeded in alleging their common law fraud claim against DTUS under an agency argument. Plaintiffs point to no manifestation from DTUS to DTB indicating bestowal of authority to DTB nor to any express or implied communication by DTUS to a third party from which it would be reasonable to infer that DTB had DTUS' authority to perform its audits.[33]

---

**30.** The Court of Appeals in *White* specifically held that, where plaintiffs are members of a "limited class whose reliance on the audit ... was, or at least should have been, specifically foreseen," then a duty "is imposed by law and it is not necessary to state the duty in terms of contract or privity." *White,* 372 N.E.2d at 319.

**31.** DTT argues that the plaintiffs' claims of negligence and gross negligence are also precluded by the Martin Act, N.Y. Gen. Bus. Law., art. 23–A, §§ 352 *et seq.* Because DTT raised this argument for the first time in its reply brief it will not be considered. *See Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (holding that it would not consider arguments raised in a reply brief

because "[w]e repeatedly have said that we will not consider contentions first advanced at such a late stage.")

**32.** Plaintiffs argue that, in the alternative, DTUS may be held liable for securities fraud through a piercing-the-veil theory. The elements of a piercing-the-veil cause of action are discussed above. The plaintiffs have not alleged that DTB lacked any corporate form, or that DTUS used its control of DTB to perpetrate a fraud.

**33.** For the reasons elucidated in the discussion of DTT's motion to dismiss, the plaintiffs have failed to state a claim for this or any other state claim against DTUS under a partnership by estoppel theory.

Similarly, plaintiffs have insufficiently pled aiding and abetting both common law fraud and breach of fiduciary duty because they have not alleged that DTUS substantially assisted the perpetration of that fraud. Finally, plaintiffs' negligence, gross negligence and malpractice claims fail. The plaintiffs contend that investors were "entitled to presume" that DTUS issued the audits because the reports are signed "Deloitte & Touche" and represented that the audits had been conducted in conformity with U.S. GAAS and GAAP regulations. As discussed above, however, neither the Offer Memo nor the audit reports mention DTUS or include its logo. Accordingly, all claims against DTUS are dismissed.

### G. FAM

FAM argues generally that as a small broker who served only as an executing broker for some of the Fund's trades, its role was too small and too tangential to subject it to liability by the plaintiffs. While it brings its motion to dismiss under Rules 12(b)(1) and (b)6, and 9(b), FAM makes two main arguments: (1) Plaintiffs have failed adequately to allege the "actual knowledge" and "substantial assistance" required for aiding and abetting both common law fraud and breach of fiduciary duty; and (2) Plaintiffs' negligence and gross negligence claims should be dismissed because of failure to allege that FAM owed a duty to the plaintiffs or that its actions caused any damage to them. FAM also argues that the Court should decline to exercise supplemental jurisdiction over FAM as a pendent party should the Court dismiss the other parties in this action. This argument, however, is mooted by the decisions already rendered here.

1. *Aiding and Abetting Common Law Fraud & Aiding and Abetting Breach of Fiduciary Duty*

FAM argues that as a small broker, serving as an executing broker for some of the Fund's trades, it neither knew of nor played a substantial role in Berger's fraud. The plaintiffs have, however, alleged that FAM received the accurate Bear Stearns statements as well as audit confirmation requests from Deloitte. Because the Deloitte audits were based on Berger's fictitious financial statements, they materially misrepresented the Fund's financial condition and differed from the Bear Stearns statements. Plaintiffs have also alleged that Berger shared its offices with FAM and that, as the introducing broker, FAM collected "substantial commission income." These facts give rise to a fair inference that FAM knew of Berger's fraud.

Further, the plaintiffs allege that FAM ignored Deloitte's instructions to transmit its audit confirmation responses directly to Deloitte and complied with Berger's "highly irregular" request to send them to him. FAM sent unsealed Airborne Express envelopes to Berger, together with waybills made out to DTB and falsely showing FAM as the sender. According to the plaintiffs, Berger subsequently replaced the Bear Stearns financial statements with his own fraudulent statements before sending them on to DTB. While FAM contests the seriousness of these actions, they are sufficient at the pleading stage to show that FAM affirmatively and substantially assisted Berger in committing his fraud on the plaintiffs.

2. *Negligence and Gross Negligence*

The necessary elements for pleading negligent misrepresentation in the absence of a contractual relationship are discussed above. Plaintiffs have failed to allege any conduct linking FAM to the investors. Accordingly, the negligence and gross negligence claims against FAM are dismissed.

498

## CONCLUSION

For the reasons discussed above, the motions by Bear Stearns & Co., Inc., Bear Stearns Securities Corp., Ernst & Young International, Deloitte Touche Tohmatsu, and Deloitte & Touche LLP to dismiss the Cromer action are granted in their entirety. The negligence and gross negligence claims are dismissed against Financial Asset Management, Inc. The federal claims and the claims of negligence, gross negligence, and professional malpractice are dismissed against Kempe & Whittle Associates Ltd.

The remaining motions to dismiss the Cromer action are denied. The parties shall have ten days in which to notify the Court why the analysis in this Opinion does not resolve the motions to dismiss the claims in the Argos Complaint as well.

SO ORDERED.